No. 03-736

IN THE SUPREME COURT OF THE STATE OF MONTANA

2004 MT 389

IN THE MATTER OF THE MENTAL
HEALTH OF C.R.C.,

        Respondent and Appellant.

APPEAL FROM:    District Court of the Nineteenth Judicial District,
In and For the County of Lincoln, Cause No. DI-03-4
Honorable Michael C. Prezeau, Presiding Judge

COUNSEL OF RECORD:

        For Appellant:

        Scott B. Spencer, Attorney at Law, Libby, Montana

        For Respondent:

        Hon. Mike McGrath, Attorney General; Jim Wheelis,
Assistant Attorney General, Helena, Montana

        Bernard G. Cassidy, Lincoln County Attorney, Libby, Montana

Submitted on Briefs:  June 1, 2004

Decided:  December 29, 2004

Filed:

_____
Clerk

Chief Justice Karla M. Gray delivered the Opinion of the Court.

¶1     C.R.C. appeals from the order entered by the Nineteenth Judicial District Court, Lincoln County, committing her to the Montana State Hospital. We reverse and remand.

¶2     The restated issue on appeal is whether the District Court erred in finding that, because of her mental disorder, C.R.C. presented an imminent threat of injury to herself or others.

## BACKGROUND

¶3     On July 29, 2003, at approximately 11 o'clock in the morning, Lincoln County Sheriff Daryl Anderson and Libby Police Sergeant Brent Teske responded to an anonymous telephone call from a neighbor of C.R.C.'s, reporting that C.R.C. and Brent Croucher had been arguing for three hours and shots were fired. After investigating Croucher's residence and finding no disturbance there, the officers heard noises coming from the direction of C.R.C.'s trailer. Teske proceeded there on foot and observed C.R.C. walking back and forth inside her trailer, yelling. Anderson drove to the trailer and also observed C.R.C. walking back and forth. At Anderson's request, C.R.C. came out of her residence. She was home alone and did not have a firearm.

¶4     C.R.C., who was unemployed, had no electricity and no running water. She had an indoor wood stove, however, and hauled water from one of her neighbors' homes to her trailer. Two fire pits made of stone, along with at least one pot and one pan, were outside C.R.C.'s home. Anderson observed that neither of the fire pits was burning or smoldering.

2

¶5     C.R.C. told the officers she had heard a shot coming from the hill behind her trailer. Two detectives went to the hill to investigate and C.R.C. accompanied them. They found no one there.

¶6     When C.R.C. and the detectives returned, Anderson asked his office to contact the local mental health center. He did so because he "felt that we needed to do something with [C.R.C.], you know." The center advised him to take C.R.C. to the hospital.

¶7     When Anderson told C.R.C. he was taking her to the hospital, she resisted and told him "[he didn't] have any legal right to take [her] anywhere." Officers grabbed C.R.C.'s arms to escort her to Anderson's vehicle. C.R.C. twisted, thrashed and kicked Teske in the shin. Officers physically restrained her and dragged her toward the vehicle. At Anderson's direction, Teske handcuffed C.R.C. when they reached the vehicle. Anderson transported her to the hospital.

¶8     At the hospital, C.R.C. remained handcuffed. She yelled, swore, and did not cooperate with the medical staff's attempts to examine her or sedate her. C.R.C. later stated that, as a Jehovah's Witness, she was aware of her right not to be medicated against her will. C.R.C. characterized treatment without her consent as illegal and as an assault. Ultimately, three officers held her down and the medical staff sedated her. Dr. Mark Heppe, the emergency room physician, assessed C.R.C. as having psychosis with agitation. Cindy Jensen, the director of the Western Montana Mental Health Center, interviewed C.R.C. in the emergency room.

¶9     The next day, at Heppe and Jensen's request, the State of Montana filed a petition alleging C.R.C. suffered from a mental disorder and required commitment; an emergency room report by Heppe and emergency room notes by Jensen were attached to the petition. The District Court concluded the petition established probable cause to proceed, appointed counsel for C.R.C. and appointed Heppe as the "professional person" required by statute to examine C.R.C. without unreasonable delay and make a written report to the court. The following day--July 31, 2003--the court held an initial hearing at which it scheduled trial for August 5 and stated it might revisit the issue of the professional person because Heppe's availability was questionable. At trial, Anderson, Teske, Lincoln County Sheriff's Deputy Mark Jacobson, and certified mental health professional Eric Greenburg testified for the State. C.R.C. testified on her own behalf.

¶10     After trial, the District Court entered its Findings of Fact, Conclusions of Law and Order, committing C.R.C. to the Montana State Hospital for a period not to exceed 90 days. It also authorized physicians there to administer medication by injection if necessary. C.R.C. appeals. We set forth additional facts as necessary in our discussion below.

## STANDARD OF REVIEW

¶11     In reviewing the sufficiency of the evidence in a civil commitment case, we do not disturb a district court's findings of fact unless they are clearly erroneous, and we view the evidence in a light most favorable to the prevailing party. *In re Mental Health of S.C.*, 2000 MT 370, ¶ 8, 303 Mont. 444, ¶ 8, 15 P.3d 861, ¶ 8 (citations omitted). A finding is clearly erroneous if it is not supported by substantial evidence, if the trial court misapprehended the

4

effect of the evidence, or if this Court has a definite and firm conviction after reviewing the record that a mistake has been made. *Matter of Mental Health of L.C.B.* (1992), 253 Mont. 1, 6, 830 P.2d 1299, 1302 (citation omitted).

## DISCUSSION

¶12     Did the District Court err in finding that, because of her mental disorder, C.R.C. was an imminent threat of injury to herself or others?

¶13     Title 53, Chapter 21, Part 1, MCA, sets forth Montana's statutes governing involuntary commitment. These statutes are critically important due to the "calamitous effect of a commitment," which includes loss of liberty and damage to the respondent's reputation. Therefore, the statutes are to be strictly followed. *In re Mental Health of D.L.T.*, 2003 MT 46, ¶ 8, 314 Mont. 297, ¶ 8, 67 P.3d 189, ¶ 8 (citation omitted).

¶14     In an involuntary commitment case, the trial court first determines whether the respondent suffers from a mental disorder; if a mental disorder is established, the court then decides whether the respondent requires commitment. Section 53-21-126(1), MCA. In addressing whether a respondent requires commitment, the district court considers various statutory criteria, including "whether, because of a mental disorder, there is an imminent threat of injury to the respondent or to others because of the respondent's acts or omissions[.]" Section 53-21-126(1)(c), MCA. Imminent threat of injury "must be proved by overt acts or omissions, sufficiently recent in time as to be material and relevant as to the respondent's present condition." Section 53-21-126(2), MCA. Commitment is justified if the criterion in § 53-21-126(1)(c), MCA, is satisfied, based on the court's "detailed statement

of the facts upon which the court found the respondent to be suffering from a mental disorder and requiring commitment." *See* §§ 53-21-127(7) and (8)(a), MCA. Here, it is undisputed that C.R.C. suffered from a mental disorder. C.R.C. challenges only the determination that she required commitment.

¶15 The District Court's findings, conclusions and order begin with an introductory paragraph which states, among other things, that "[e]vidence was presented to the Court, including testimony and a report by Dr. Mark Heppe, M.D." The trial court's only finding relating to whether C.R.C. required commitment is the following:

> Because of her mental disorder, Respondent presents an imminent threat of injury to herself and others for the reasons set forth in the testimony and report of Dr. Mark Heppe, M.D., and the testimony of Cindy Jensen, Sheriff Daryl Anderson, and Libby Police Officer Brent Teske.

¶16 We observe at the outset that the District Court's finding totally fails to satisfy the "detailed statement of the facts" requirement set forth in § 53-21-127(8)(a), MCA. In previous cases, we have stated that a trial court's failure to make a detailed statement of the facts may be harmless, while also discouraging trial judges from using "shortcut" measures. *See Matter of R.J.W.* (1987), 226 Mont. 419, 424, 736 P.2d 110, 113; *Matter of D.D.* (1996), 277 Mont. 164, 169, 920 P.2d 973, 976. C.R.C. does not raise the absence of a detailed statement of the facts as an issue on appeal, however. Consequently, we need not address whether reversal on that basis alone would be appropriate. We again strongly caution trial courts to strictly comply with all statutes in these involuntary commitment cases involving loss of liberty in the future. *See D.L.T.*, ¶ 8.

6

¶17   We turn now to the evidence on which the District Court relied in finding that "[b]ecause of her mental disorder, [C.R.C.] present[ed] an imminent threat of injury" to herself or others.  C.R.C. asserts that, while the State established she suffered a mental disorder, the only evidence of an imminent threat of injury was her resistance to being detained.  The State advances no argument based on C.R.C.'s resistance to being detained.  It does assert that, prior to her detention, C.R.C.'s mental condition "had progressed to the point where she was under the effect of delusions that impaired her judgment[.]" That argument relates primarily to C.R.C.'s mental disorder, the existence of which she does not challenge.  Thus, we focus on whether the evidence of C.R.C.'s pre-detention behavior relied on by the District Court supports the finding that C.R.C. presented an imminent threat of injury due to her mental disorder.

¶18   As set forth above, the District Court first relied on "the testimony and report of Dr. Mark Heppe, M.D."  Heppe's only report, however, was his emergency room report, which was prepared before he was appointed as the professional person and was attached to the State's petition for commitment for purposes of establishing probable cause.  *See* §§ 53-21-121(2)(c) and -122(2), MCA.  In addition, Heppe's initial report contains hearsay statements which would have been inadmissible at trial.  *See* § 53-21-126(3), MCA; *D.L.T.*, ¶¶ 10-18.  Finally, the record is clear that Heppe did not testify at the hearing on the State's petition.  Therefore, we conclude the District Court's reliance on Heppe's "testimony and report" is misplaced.

7

¶19 The District Court also stated it relied on "the testimony of Cindy Jensen." Like Heppe, Jensen did not testify at the hearing. Her only contribution to the record consists of her emergency room notes containing hearsay statements which, like Heppe's report, were submitted for purposes of establishing probable cause. Thus, we conclude the District Court's reliance on Jensen's "testimony" also is misplaced.

¶20 The District Court next relied on the actual testimony of Sheriff Daryl Anderson. Anderson had known C.R.C. for "twenty some years" and, on the day in question and the next day, learned that she did not have electricity and had been getting water from her neighbors. He testified that when C.R.C. came out of her home to speak with him, she denied owning a gun and said "if she had a gun she had shot somebody." He also stated that the temperature on July 29 was "probably in the 80's" and fire danger was "very high" but not "extreme" and no ban on outside fires was in effect. Anderson saw no smoldering or burning in either of C.R.C.'s fire pits, but opined that it "looked like at one time she was building bigger fires." When asked whether he believed it would be dangerous to other people "if indeed, [C.R.C.] was cooking outdoors at her residence," Anderson answered in the affirmative.

¶21 We discern nothing in Anderson's testimony regarding C.R.C.'s lack of electricity and running water that could establish an "imminent threat of injury" to C.R.C. or others. Nor does the State present any argument in this regard.

¶22 Regarding Anderson's testimony of C.R.C.'s statement that "if she had a gun she had shot somebody," we reiterate that imminent threat of injury must be evidenced by overt acts

8

sufficiently recent as to be material and relevant to the person's present condition, and the danger must be fairly immediate. *See* § 53-21-126(2), MCA; *D.D.*, 277 Mont. at 168, 920 P.2d at 975. We have recognized that a threat to kill may constitute an "overt act" and that commitment is required "'[w]hen there is proof beyond a reasonable doubt that there is a present indication of probable physical injury likely to occur at any moment or in the immediate future, coupled with the finding . . . that the individual is suffering from a mental disorder[.]'" *In re Mental Health of E.M.* (1994), 265 Mont. 211, 213, 875 P.2d 355, 356-57 (quoting *In re F.B.* (1980), 189 Mont. 229, 233, 615 P.2d 867, 869-70). There, we concluded a woman's repeated threats to kill herself and her neighbor, combined with her stated intent to obtain a gun and a professional's opinion that the threats constituted a "very clear danger" satisfied the "overt acts" requirement. *E.M.*, 265 Mont. at 214, 875 P.2d at 357. In other words, we determined a threat to kill is an overt act establishing a likelihood of physical injury when the respondent evidences an intent to carry out the threat in the fairly immediate future.

¶23 Unlike the threats in *E.M.*, C.R.C.'s statement that "if she had a gun she had shot somebody" contains no threat of injury to anyone. Moreover, the record reflects C.R.C. did not have a gun. Therefore, unlike the respondent in *E.M.*, C.R.C. did not demonstrate an intent or ability to shoot someone. We conclude C.R.C.'s statement does not constitute an overt act. We further conclude that Anderson's testimony regarding the statement does not support the District Court's finding that C.R.C. presented an imminent threat of injury.

¶24 With respect to outdoor cooking and Anderson's belief that it would be dangerous to others, C.R.C. argues Anderson's testimony proved only that she had cooked with an outside fire contained in a fire ring at some point and that no fire restriction was in place on the date she was detained. The State asserts Anderson's testimony established that, despite the lack of a fire ban, it was "still dangerous" to have an outside fire and C.R.C.'s psychosis left her with "poor judgment" about the fire danger.

¶25 We need only observe, in these regards, that having outside fires in Montana in July is often potentially dangerous. We recognize that many Montanans, some of whom are located in secluded areas, have outdoor fires--for cooking or other reasons--during forest fire seasons. Such fires may present a potential danger and reflect poor judgment. If law enforcement officers observe fires that violate bans or other laws, they may issue warnings and citations accordingly. Here, however, no ban on fires existed in C.R.C.'s locale. Consequently, we simply cannot elevate the entirely speculative possibility that C.R.C. could inadvertently cause an uncontrolled fire by cooking outdoors to an imminent threat of injury.

¶26 The State argues, however, that the fire danger situation in the present case is analogous to that described in *D.D.*, 277 Mont. at 166, 920 P.2d at 974. Its position is without merit.

¶27 In *D.D.*, the respondent requested that police officers come to his apartment to hear his concerns about other tenants in the building. On arrival, the officers found papers in the oven, the oven timer turned on and the smoke detector not operational. The respondent objected to inspection of his apartment by fire officials. On those bases, an officer took the

respondent to a hospital for psychiatric evaluation. During the subsequent commitment hearing, a psychiatrist testified--based on his evaluation--that the respondent was a danger to himself and others due to his paranoia about being attacked. *D.D.*, 277 Mont. at 166, 920 P.2d at 974. The district court determined he was seriously mentally ill. *D.D.*, 277 Mont. at 167, 920 P.2d at 975.

¶28 The issue on appeal was whether there was sufficient evidence of an overt act to find the respondent "seriously mentally ill," as defined in § 53-21-102(15), MCA (1993). *D.D.*, 277 Mont. at 167-68, 920 P.2d at 975. The respondent argued that the record contained no evidence of any overt act in which he was violent, threatening or suicidal, and that he was committed only because he kept papers in his oven. *D.D.*, 277 Mont. at 168, 920 P.2d at 975. We concluded the record contained sufficient evidence that he was seriously mentally ill, based on the respondent's statements establishing paranoia and a psychiatrist's testimony that the man could "very easily" attack someone under the mistaken belief that he was being attacked. *D.D.*, 277 Mont. at 168-69, 920 P.2d at 975.

¶29 *D.D.* is readily distinguishable from the present case. First, a different statutory scheme regarding involuntary commitments was in effect. Second, the issue before us here is whether C.R.C. required commitment, not the existence of her mental disorder. Finally, regarding the State's position that the fire danger here is analogous to that in *D.D.*, our analysis and conclusion in *D.D.* did not relate in any way to fire danger. The only reference therein was the respondent's argument.

11

¶30 We conclude that Anderson's testimony, when viewed in a light most favorable to the State, does not constitute sufficient evidence to support a finding of imminent threat of injury to C.R.C. or others. Nor, of course, does--or could--the testimony of Anderson, a law enforcement officer, tie any of C.R.C.'s conduct to her mental disorder, as § 53-21-126(1)(c), MCA, requires to support an involuntary commitment.

¶31 The final testimony on which the District Court relied was that of Sergeant Brent Teske. Teske stated he followed C.R.C. into her trailer and, after she returned from the bathroom, he smelled a raw sewage odor that he did not investigate. He also recounted that C.R.C. had told him she did not have electricity or running water.

¶32 As set forth above, the absence of electricity and running water does not establish an imminent threat of injury. The same is true of the raw sewage odor noticed by Teske at one moment in time and not investigated. The State asserts, however, that C.R.C. had "poor judgment" and created a health risk by flushing her toilet with buckets of water and leaving raw sewage unflushed.

¶33 It may well be that C.R.C. had "poor judgment" in a number of regards; poor judgment is a not uncommon human condition. Nothing in the record establishes any imminent threat of injury from flushing a toilet with a bucket of water or leaving raw sewage unflushed in one's home for a period of time. Indeed, nothing of record establishes what health risks could arise over a long period of time from these practices. We conclude that, when viewed in a light most favorable to the State, Teske's testimony does not constitute

12

substantial evidence to support a finding that C.R.C.'s living conditions presented an imminent threat of injury to herself or others.

¶34 In summary, we conclude that none of the evidence on which the District Court relied supports its finding that, due to her mental disorder, C.R.C. presented an imminent threat of injury. The State argues, however, that the testimony of Eric Greenburg supports the District Court's finding and its resulting commitment of C.R.C.

¶35 In applying the clearly erroneous standard to a trial court's finding of fact, we ordinarily would consider whether any evidence in the record supports the finding. *See, e.g.*, *D.D.*, 277 Mont. at 168-69, 920 P.2d at 975. Here, however, the District Court expressly delineated the bases for its finding, and, as set forth above, those bases do not support the finding.

¶36 Moreover, we observe that Greenburg met with C.R.C. for twenty minutes on the morning of the hearing. At that time, he was not the professional person appointed at the initial hearing pursuant to § 53-21-122(2), MCA. Nor was the Greenburg the professional person required to examine C.R.C. pursuant to § 53-21-123(1), MCA. Heppe remained the appointed professional person through the time of Greenburg's examination and until the hearing at which the court "appointed" him. Therefore, we conclude Greenburg's testimony cannot be used to support the District Court's finding that C.R.C. required commitment.

¶37 The State asserts, however, that C.R.C.'s commitment is justified under § 53-21-126(1)(d), MCA, which provides in part that a district court shall consider whether a respondent's mental disorder "will, if untreated, predictably result in deterioration of the

respondent's mental condition to the point at which the respondent will become a danger to self or to others[.]" The State presents no argument or authorities in this regard. Rule 23(b), M.R.App.P., requires a respondent to set forth a well-reasoned argument containing citations to authority and to the record, and it is not this Court's obligation to guess at a party's position or develop supporting analysis. *See Harland v. Anderson Ranch Co.*, 2004 MT 132, ¶ 33, 321 Mont. 338, ¶ 33, 92 P.3d 1160, ¶ 33 (citation omitted). In any event, absent an opinion by a properly appointed professional person who examined C.R.C., the § 53-21-126(1)(d), MCA, criterion could not be established.

¶38 Reversed and remanded for entry of an order vacating the Order of Commitment.


/S/ KARLA M. GRAY


We concur:

/S/ JAMES C. NELSON
/S/ JIM REGNIER
/S/ PATRICIA O. COTTER
/S/ W. WILLIAM LEAPHART
/S/ JIM RICE

Justice James C. Nelson concurring.

¶39   I concur in the Court's Opinion.  I add two observations.

¶40   First, in *In re Mental Health of K.G.F.*, 2001 MT 140, 306 Mont. 1, 29 P.3d 485, we emphasized the duty of the courts to safeguard "at *every* stage of the proceedings" the due process rights of individuals subject to involuntary mental health commitments.  We stressed that the courts must rigorously adhere to the mandated statutory standards.  *In re K.G.F.*, ¶ 42.  In that case, we strongly criticized the fact that K.G.F.'s appointed counsel had only four or five hours to prepare for what we described as a "perfunctory process that lasted minutes." *In re K.G.F.*, ¶ 43.  And, we observed that the person's Article II, Section 17, due process rights are not protected when counsel has little time to prepare for a hearing that infringes on a person's relationships and liberty.  *In re K.G.F.*, ¶ 42.

¶41   These observations and criticisms are equally pertinent when it comes to the appointment of the professional person under § 53-21-122(2), MCA.  In ¶ 36, we note that Eric Greenberg--who was not even appointed at the time--met with C.R.C. for twenty minutes on the morning of the hearing.  This statute requires more than the sort of examination that occurred here.  Indeed, this statute contemplates that the court will appoint the professional person at the time of the person's initial appearance, and that the hearing will not be on the same day as the initial appearance but within five days thereafter.  These statutory requirements as to the appointment of the professional person were not rigorously followed here.

¶42   Plainly, if the due process rights of the person being committed are to be anything more than hollow guarantees, all participants in the process--whether counsel or the

15

examining professional person--must exercise their respective duties with sufficient time and deliberation to ensure that the interests of the person are protected in fact and not simply in theory.

¶43    Second, this case exemplifies an unfortunate conundrum. Despite how expeditiously the trial court may handle the case, by the time the involuntarily committed person is able to obtain appellate review, the damage of an improper commitment has already been done. As here, the involuntarily committed person has been restrained of her liberty for at least ninety days; she has suffered the violation of her fundamental rights to individual privacy, liberty, and due process; and she must henceforth forever bear the stigma of having been involuntarily committed as being seriously mentally ill. *See In re K.G.F.*, ¶ 53. Under these circumstances an after-the-fact appeal is not an adequate remedy.

¶44    In a somewhat analogous situation--where the state seeks, via a temporary custody order, to deprive parents of their fundamental right and liberty interest in parenting--we have taken the position that in some circumstances an appeal is not an adequate remedy. We have held that, given the gravity of the issues, extraordinary relief by way of supervisory control is appropriate where the court is proceeding under a mistake of law and causing a gross injustice. *In re D.A.*, 2003 MT 109, ¶ 18, 315 Mont. 340, ¶ 18, 68 P.3d 735, ¶ 18; *See also* Rule 17, M.R.App.P.

¶45    Violations of the statutory scheme designed to protect the individual privacy, liberty and due process rights of a person being involuntarily committed for mental health reasons are no less egregious, grave and permanent, than those issues we addressed in *In re D.A.* Accordingly, we ought to be willing to discretionarily review involuntary mental health

16

commitment cases by way of supervisory control where it is clear that the statutory scheme is not being rigorously followed and where the due process rights of the person are not being protected at every stage of the proceedings. In doing so, we will be able to prevent the sorts of violations of the involuntarily committed person's fundamental rights to individual privacy, liberty and due process that are evident in that case at bar.

¶46     I concur.

/S/ JAMES C. NELSON

Justice John Warner dissents.

¶47    I must dissent.  This case presents an example of problems faced by district courts in the rural areas of Montana in dealing with those unfortunate persons alleged to be seriously mentally ill and possibly in need of commitment.

¶48    A reading of the Court's statement of what the Sheriff and the Police Sergeant found when called to C.R.C.'s trailer could lead one to believe that what they should have done is leave her to go about her business.  However, we were not there.  We did not see her, hear her shouts, assess her demeanor, view or smell her living conditions, know the surrounding area, see her when inspecting the hillside for those imps who were not there, and we are not able to assess the degree of fear in those hearing the gunfire.  The deputies did consult with mental health professionals by telephone, and were advised that C.R.C. should be taken to the hospital.  As an appellate judge, I am not willing to now find as a fact that these trained officers overcame C.R.C.'s resistance and forced her to go to the hospital for an examination because they had some animus toward her.

¶49    Once at the hospital, a licensed physician, who the State has determined qualified to make such an assessment, examined C.R.C. and told the Lincoln County Attorney that she was in need of commitment.  The County Attorney, whom the law has granted discretion to make such decisions, exercised his discretion to present the matter to a District Judge.

¶50    The petition informed the District Court that a 50 year-old woman had been the subject of numerous calls to law enforcement, law enforcement advised she was living without electricity or running water, she was hallucinating, medical professionals observed

18

that she exhibited paranoia, and neighbors reported shots had been fired after a heated argument she had been involved in. The most chilling and sad part of the petition was the diagnosis by a health care professional that this unfortunate woman, without fault on her part, was psychotic; that is, in layman's terms, she had lost touch with reality.

¶51 Unfortunately, Libby does not have the luxury of a mental health center, a psychiatric ward if you will, where C.R.C. could be suitably detained. Thus, a quick hearing was not only required by §§ 53-21-122(3), 125, MCA, things had to move swiftly as a practical matter. Nor does Lincoln County have a number of psychiatrists or certified mental health professionals, one of whom would also be available for the coming trial.

¶52 Acting on the petition, the District Court promptly followed the requirements of § 53-21-122(2), MCA; found probable cause to detain C.R.C., appointed an experienced lawyer to represent C.R.C., appointed a social worker as a friend of C.R.C., a mental health professional to examine her, and set a trial date. As counsel for C.R.C. did not demand a jury, and did not waive the time limitations, the trial had to be within five days and it made no difference whether the mental health professional first appointed would be available. Section 53-21-122(3), MCA. The District Court, in fairness, made it known that the medical professional who made the report attached to the petition might not be available at trial.

¶53 At trial neither C.R.C. nor her counsel made any objection that the mental health professional who testified, Eric Greenberg, M.A., was not qualified, was not properly appointed, or had not conducted a proper examination.

¶54 At the conclusion of the trial the District Court, in addition to finding C.R.C. suffers from a mental disorder, psychosis with agitation, entered the finding of fact quoted by the Court at ¶ 15.

¶55 Unfortunately, the District Court made what I would posit is a mistake. It named Dr. Mark Heppe, M.D., in its finding of fact. Dr. Heppe did submit the initial report, but did not testify. Instead, Eric Greenberg, a certified mental health professional, submitted a report and did testify at the trial. A clerical mistake like this could be corrected *nunc pro tunc*. Rule 60(a), M.R.Civ.P. However, if the Court concludes this is not a mistake, or deems that such is fatal, it should just say so and reverse. Instead, the Court attempts to justify its decision to ignore the facts provided by Greenberg's testimony for the reasons that he did not conduct a thorough enough examination and he was not appointed as the mental health professional by formal order entered in the record. As noted above, neither of these matters was objected to by C.R.C. in the District Court and neither was argued before this Court. The appellate argument of C.R.C. is that the evidence, including that provided by Greenberg, is insufficient to support the District Court's finding of fact pursuant to §§ 53-21-126, 127, MCA, that she should be involuntarily committed for mental health treatment.

¶56 I would not ignore the testimony of Greenberg. I believe it is important and, when it is considered, the evidence is sufficient for the District Court to find, beyond a reasonable doubt, that C.R.C. required commitment under the criteria of § 53-21-127(8)(a) – (d), MCA. He testified that for the three days before she was taken to the hospital, C.R.C. had reported hearing chanting and howling on the hill behind her house that she said was related to some kind of satanic activity. He said she had advised him that she believed "burning down" the

hill would resolve the problem. She also thought the treatment she had received from the police would justify shooting them. He felt these statements, along with her actions when she was with him, lead to a diagnosis that she was psychotic and needed to be committed.

¶57     This tale about satanic activity on the hill behind her trailer and shooting people was also testified to by Sheriff Anderson, albeit in a disjointed fashion. Deputy Jacobson, who was also at C.R.C.'s trailer when she was taken to the hospital, echoed that she described terrible noises from the hillside characterized as grinding, rattling, or moaning.

¶58     C.R.C. herself testified. While she simply refused to elaborate on exactly what she thought was going on up the wooded hill behind her trailer, she did say that for the three days just prior to the time she was taken to the hospital she heard chanting, howling and shrieking coming from the hill at daybreak. She said that some type of signs were left on the hill by a Hells Angel, or terrorists. She also said that these noises and signs probably had something to do with a son of hers who had gone up the same hill and had returned with an implanted perverted eye in his forehead.[1]

¶59     As the District Court remarked, this was not an open and shut case. However, the judge was presented with evidence that C.R.C. was highly agitated and had created a disturbance. She believed there was some evil, supernatural presence on the wooded hillside behind her house, and fire was the way to be rid of it. She also felt justified in shooting some law enforcement officers. The judge had before him the definite diagnosis of a certified mental health professional that C.R.C. was actively psychotic, a danger to herself

---

[1]     The transcript seems to indicate that C.R.C. was not talking about a biological child when she said "son", but rather she usually referred to some people she associated with as her family and her kids.

and others, and required commitment. Not only did the District Judge hear the witnesses, he listened to the testimony of C.R.C. herself, and was able to form a judgment about her condition.

¶60    The record reflects that there was no suitable mental health treatment for C.R.C. available in Libby. The judge was therefore presented with two choices, (a) disagree with the mental health professional and send C.R.C. back to her trailer, hoping for the best, or (b) accept the evidence and order up to 90 days of treatment at the State Hospital. I conclude that the objective evidence of the instant, overt disturbance caused by C.R.C., the uncontradicted evidence of the reasons therefore, the actions of C.R.C. when confronted with the need to be examined, her testimony, and the opinion of the mental health professional, are, as a matter of law, sufficient to satisfy the statutory requirements. Sections 53-21-126, 127, MCA. Adding to this the ability of the District Court to see and hear the witnesses before finding the facts, I do not think a reversal is justified.

¶61    Having said that I disagree with the result reached by the Court, I must agree that the Court fairly criticizes the findings of fact in this case. Section 53-21-127(8)(a), MCA, requires detailed findings of fact, not the summary provided here. District courts must resist the pressure applied by sheriffs and county attorneys to immediately sign written findings of fact, conclusions of law and orders so that a committed mentally ill person may be transported to the State Hospital as quickly as possible. It is understandable why a sheriff's deputy is often standing outside the judge's chambers waiting for the order. In the rural counties there is no place to house the mentally ill while awaiting the necessary court papers, and in every county the cost of a delay is very large. However, wait a reasonable time they

22

must.  The law requires an extraordinarily accurate and complete record in these cases, and it must be provided.

¶62    I do not agree with the tenor of *In re Mental Health of K.G.F.*, 2001 MT 140, 306 Mont. 1, 29 P.3d 485, and the special concurrence here, which seem to imply that law enforcement, county attorneys and district courts harbor some kind of prejudice against, or disdain for, the mentally ill.  If a proper case presents itself, I am prepared to stand with those that have criticized *K.G.F.*[2]  The rights of our mentally ill citizens are taken very seriously by law enforcement, county attorneys and the district courts.  There is a great deal of concern with, and sympathy for, their plight.  It is the lack of resources that makes it so difficult to provide the assistance they need, deserve and have a right to; it is not prejudice or indifference.

¶63    I dissent.

/S/ JOHN WARNER

---

[2]   *See,* Elaine M. Dahl, Note, *Taking Liberties:  Analysis of In re Mental Health of K.G.F.,* 64 Mont. L. Rev. 295, 307 (2003).