DA 15-0679

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 329

FILED

12/13/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0679

IN THE MATTER OF:

R.H.,

      Respondent and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DI 15-0098
Honorable Rod Souza, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Chad Wright, Chief Appellate Defender, Moses Okeyo, Assistant
Appellate Defender, Helena, Montana

    For Appellee:

        Timothy C. Fox, Montana Attorney General, Katie F. Schulz, Assistant
Attorney General, Helena, Montana

        Scott Twito, Yellowstone County Attorney, Billings, Montana

Submitted on Briefs:  October 26, 2016

Decided:  December 13, 2016

Filed:

            /S/ ED SMITH
              Clerk

Justice Laurie McKinnon delivered the Opinion of the Court.

¶1 R.H. appeals from an involuntary commitment order entered by the Thirteenth Judicial District Court, Yellowstone County, on October 14, 2015. The order committed R.H. to the Montana State Hospital for a period not to exceed three months and ordered the use of involuntary medication, if needed. We affirm the order for commitment and reverse the administration of involuntary medication.

¶2 R.H. presents the following issues for review:

*1. Whether there was sufficient evidence to support the commitment of R.H.*

*2. Whether the District Court erred in authorizing involuntary medication.*

### FACTUAL AND PROCEDURAL BACKGROUND

¶3 R.H., age 72, suffers from bipolar disorder and general anxiety disorder. She takes medication for her mental illnesses. R.H. also has physical infirmities, including chronic obstructive pulmonary disease, congestive heart failure, hypertension, hyperlipidemia, diabetes and gout. She is being treated with oxygen, insulin, and other medications. In September of 2015, R.H. was evicted from her senior-living apartment at Pleasantview after having multiple altercations with her neighbors. Following her eviction, R.H.'s adult son paid for one week's lodging at a motel. However, as of October 6, 2015, R.H. had nowhere to go and her son was unsuccessful in securing other living arrangements. R.H. lives on a limited fixed income controlled by a conservator, Joyce Wuertz (Wuertz).

¶4 On October 6, 2015, R.H.'s son and Wuertz contacted R.H.'s treating physician, Dr. Amstutz, because they were concerned about where R.H. was going to live and that R.H. was exhibiting mood swings and other symptoms of her bipolar disorder. Further,

2

R.H. had made a suicidal comment and did not appear to understand that her finances prevented her from continuing to stay in a hotel. Dr. Amstutz requested that R.H. be picked up by law enforcement and transported to the Billings Clinic Psychiatric Center for evaluation.

¶5 Upon admission to the Billings Clinic, R.H. was evaluated by Dr. Schuett. Dr. Schuett determined R.H. suffered from a mental disorder and needed treatment. Thereafter, the Yellowstone County Attorney's Office filed a petition on October 8, 2015, to involuntarily commit R.H. At the initial hearing held October 9, 2015, the court found probable cause to believe R.H. was suffering from a mental disorder which might need commitment, and set trial on the State's petition for October 14, 2015. The court appointed R.H. counsel and subsequently appointed, on October 13, 2015, Bonnie Karinen (Karinen) to evaluate R.H. Karinen is a nurse practitioner with an emphasis in psychiatry.

¶6 On October 13, 2015, Karinen filed a report with the court describing R.H.'s moods as labile; that R.H. exhibited grandiose thoughts and irrational decision-making; and that R.H. easily became irritable or cried. Karinen concluded R.H. suffered from a mental disorder requiring commitment because R.H. was unable to care for herself. During the hearing on October 14, 2015, Karinen testified consistent with her report and added that she believed the court should order involuntary medication for R.H. Karinen explained, "[i]n most cases for the safety of the patient and possibly others, you know, we usually do recommend [involuntary medication], and I would in this case, too." Karinen

3

testified, however, that R.H. had no history of refusing her medication and that, at the time, R.H. was compliant and had been taking her medication as directed.

¶7 The evidence produced at trial established that R.H. either applied for or otherwise considered multiple types of housing, including Section 8 or HUD housing, hotels, nursing homes, assisted living, a crisis center, and a friend's home. In each instance, R.H. was unsuccessful in securing housing, either because her request was denied or not responded to, or because R.H., herself, was uncooperative. Karinen testified that, "once a patient is a patient in the psychiatric center when we sen[d] the records, especially if there is any behavioral issues, it's highly unlikely that any [nursing home] will take her."

¶8 Following the hearing, the District Court issued its Finding of Facts, Conclusion of Law and Order. The District Court found that R.H. suffered from a mental disorder; was unable to care for herself; the Montana State Hospital was the least restrictive treatment option available to R.H.; and that administration of medication "may be necessary to facilitate treatment" for R.H. The court reasoned that, "because of her mental disorder, she could abruptly decide not to take her medications."

## STANDARD OF REVIEW

¶9 We review a civil commitment order by a district court to determine whether its conclusions of law are correct and whether the court's findings of fact are clearly erroneous. *In re Mental Health of L.K.-S.*, 2011 MT 21, ¶ 14, 359 Mont. 191, 247 P.3d 1100. "A finding of fact is clearly erroneous if 'it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence or if, after a review of the entire record, we are left with the definite and firm conviction that a

4

mistake has been made.'" *In re C.R.*, 2012 MT 258, ¶ 12, 367 Mont. 1, 289 P.3d 125 (quoting *L.K.-S.*, ¶ 14).

¶10 "Whether a district court's findings of fact satisfy statutory requirements is a question of law." *In re S.M.*, 2014 MT 309, ¶ 13, 377 Mont. 133, 339 P.3d 23. "We have long emphasized the necessity of 'strict adherence' to the statutory scheme governing involuntary commitment, given the utmost importance of the rights at stake in such proceedings, and the 'calamitous effect of a commitment, including loss of liberty and damage to a person's reputation.'" *In re B.D.*, 2015 MT 339, ¶ 7, 381 Mont. 505, 362 P.3d 636 (citation omitted).

## DISCUSSION

¶11 *1. Whether there was sufficient evidence to support the commitment of R.H.*[1]

¶12 The District Court concluded, relying on § 53-21-126(1)(a), MCA, that R.H. could not meet her "basic needs." Basic needs are "food, clothing, shelter, health, or safety." Section 53-21-126(1)(a), MCA. When committing a person pursuant to § 53-21-126(1)(a), MCA, the court must find that the person suffers from a mental disorder and that "*because of a mental disorder*, is substantially unable to provide for the [person's] own basic needs[.]" (Emphasis added.)

¶13 It is undisputed that R.H. has a mental disorder and is currently unable to meet her own basic needs; specifically, R.H. is unable to find housing. R.H. argues, however, that her inability to find housing is not *because* of her mental disorder. R.H. maintains that

---

[1] This appeal is not moot. Appeals from judgments of civil commitment are not rendered moot by expiration of the commitment. *In re Mental Health of D.V.*, 2007 MT 351, ¶¶ 31-32, 340 Mont. 319, 174 P.3d 503.

she is simply a person with a mental disorder who is having a housing crisis; not that she is homeless *because* she has a mental disorder. R.H. believes that her inability to find housing is due to her lack of family support and financial resources.

¶14 We will only disrupt a district court's finding of fact and conclusions of law if we determine factual findings are clearly erroneous or legal conclusions are incorrect. *L.K.-S.*, ¶ 14. The District Court found that R.H. was unable to meet her basic needs. Testimony established that R.H. suffers from bipolar disorder which is characterized by fluctuating mood swings frequently exhibited by symptoms of mania and depression. Bipolar disorder is incurable, but treatable with medication, therapy, and the assistance of social supports. R.H. exhibited symptoms typical of a bipolar disorder by being irritable, frequently emotionally disturbed, and having irrational thoughts, paranoia, poor insight, and poor decision-making ability. The State produced evidence that R.H. was unaware of her financial limitations regarding housing options; that R.H.'s disorganized thoughts prevented R.H. from caring for herself; and that R.H.'s beliefs that she would soon find housing were fanciful, at best.

¶15 After careful review of the record, we conclude the District Court correctly determined that R.H. was unable to provide for her basic need of shelter *because* of her mental disorder and that the requirements of § 53-21-126(1)(a), MCA, were therefore satisfied. R.H. was evicted because of problems she was having with her neighbors which were a result of her mental disorder. There was substantial evidence to support the District Court's conclusion that R.H.'s bipolar disorder and history of conflict with neighbors prevented R.H. from obtaining and securing housing. We reject R.H.'s

6

argument that the District Court committed her simply because she was homeless; rather, the District Court correctly concluded that R.H's inability to find shelter was because of her mental disorder.

¶16    2. *Whether the District Court erred in authorizing involuntary medication*.

¶17    The District Court held in its Finding of Facts and Conclusion of Law that involuntary medication "may be necessary to facilitate treatment." R.H. argues that the evidence does not support a finding of actual necessity to authorize involuntary medication. The State maintains that whether involuntary administration of medication "is necessary" must be considered within the context of the statute as a whole. Specifically, the State argues that § 53-21-127(6), MCA, sets forth three distinct levels of authority which must be met before medication is involuntary administered: (1) the district court's authorization, (2) approval by the chief medical officer or designated physician, and (3) review by the involuntary medication review committee. Accordingly, the State maintains R.H.'s construction of the statute is too narrow and, as a practical matter, district courts do not ultimately make the decision as to whether involuntary medication should be administered.

¶18    We have held that due to the constitutional rights at stake during an involuntary commitment, we require "'strict adherence' to the statutory scheme." *In re C.R.*, 2012 MT 258, ¶ 13, 367 Mont. 1, 289 P.3d 125; *In re R.W.K.*, 2013 MT 54, ¶ 18, 369 Mont. 193, 297 P.3d 318. Pursuant to § 53-21-127(6), MCA, "[t]he court may authorize the chief medical officer of a facility or a physician designated by the court to administer appropriate medication involuntarily if the court finds that involuntary medication *is*

*necessary* to protect the respondent or the public or to facilitate effective treatment." (Emphasis added.) If a commitment order includes involuntary medication, the court "shall make [a] . . . finding of fact [establishing] . . . the reason involuntary medication was chosen from among other alternatives." Section 53-21-127(8)(h), MCA.

¶19 Here, the District Court did not find that involuntary medication "is necessary;" rather, the District Court found that involuntary medication "may be necessary to facilitate treatment." The District Court concluded that although "[s]he has taken her medications while detained at the Clinic, but because of her mental disorder, she could abruptly decide not to take her medications." Indeed, while we determine the District Court's conclusion incorrectly applied the law, it was consistent with the evidence that involuntary medication, while not currently necessary, may become necessary in the future. Karinen explained

> Q What is your opinion on the involuntary administration of medication facility treatment? Do you believe the Court should order that?
> A Yes. In most cases for the safety of the patient and possibly others, you know, we usually do recommend that, and I would in this case, too.
> Q But [R.H.] hasn't been declining to take her medication?
> A No, she has been very compliant with her treatment.
> Q So [R.H.] suffers from a mental disorder?
> A Yes.
> Q She suffers from a bipolar disorder?
> A Yes.
> Q Because of her bipolar disorder she is unable to care for herself?
> A Yes.
> Q Because of her bipolar disorder she may be a threat to herself?
> A Yes.
> Q And you believe the least-restrictive treatment option available to her is the Montana State Hospital at this time?
> A Unfortunately, yes.

8

Q And you'd recommend the involuntary administration of medication to facilitate treatment?
A Yes.

¶20 Despite support in the record that involuntary medication "may be necessary" in the future and the District Court's conclusion to the same effect, such a finding and conclusion does not satisfy the statute's clear requirement that before involuntary medication is ordered by a court, the court must find that medication "is necessary." Nor does the tiered level of review provided in subsection (8) of § 53-21-127, MCA, dilute the statutory requirement and obligation of the court to find that involuntary medication "is necessary."

> "[T]he office of the judge is simply to ascertain and declare what is in terms or in substance contained therein, not to insert what has been omitted or to omit what has been inserted. Where there are several provisions or particulars, such a construction is, if possible to be adopted as will give effect to all."

Section 1-4-101, MCA. Accordingly, we will not alter the clear words of the statute by declaring that "is necessary" means "may be necessary," as to do so would violate maxims of jurisprudence and the plain language of the statute.

¶21 Based upon the record before us, R.H. had never refused to take her medication and, in fact, had been compliant in taking her medication while at the Billings Clinic and detained awaiting her trial. A finding or general understanding that an individual with bipolar disorder may at some undisclosed future point in time decide not to take her medications is insufficient to satisfy the plain language of the statute requiring that involuntary medication "is necessary." Had a standard other than "is necessary" been the goal and intent of the legislature when it addressed forced medication of mentally ill

9

individuals, the legislature could have provided as much. Instead, it chose to use "is necessary" rather than "may be necessary," clearly implying a heightened standard of consideration before involuntary medication may be utilized. This is consistent with other statutory sections contained within Title 53, chapter 21, MCA, pertaining to the mentally ill. The legislature sought to enhance protection against forced medication of the mentally ill by enacting § 53-21-145, MCA, specifically declaring that "[p]atients have the right to be free from unnecessary or excessive medication." Accordingly, we have little difficulty strictly enforcing the statutory requirement that there must be evidence supporting a finding and conclusion that involuntary medication "is necessary." A finding and conclusion that in the future a person may become noncompliant is insufficient to meet this statutory requirement. We find no basis on the record before us to conclude that R.H. would not take her medication and that it was necessary for the court to issue an order forcing her to do so.

¶22 Finally, we observe that should necessity for involuntary medication arise subsequent to entry of the commitment order, there are no statutory provisions which would prevent issuance of an order authorizing involuntary medication under such circumstances, provided due process demands have been satisfied.

## CONCLUSION

¶23 We conclude there was sufficient evidence to support R.H.'s involuntary commitment and affirm the commitment order. We reverse the portion of the order authorizing involuntary medication because there was insufficient evidence to support the

10

requirement that an involuntary medication order was necessary and the District Court erred in concluding the statute did not require involuntary medication was necessary.

/S/ LAURIE McKINNON

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ BETH BAKER
/S/ JIM RICE