FILED

05/26/2020

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 18-0326

DA 18-0326

## IN THE SUPREME COURT OF THE STATE OF MONTANA

2020 MT 137N

IN THE MATTER OF:

C.T.D.,

      Respondent and Appellant.

APPEAL FROM:    District Court of the Tenth Judicial District,
In and For the County of Fergus, Cause No. DI 18-9
Honorable Brenda R. Gilbert, Presiding Judge

COUNSEL OF RECORD:

    For Appellant:

        Chad Wright, Appellate Defender, Danny Tenenbaum, Assistant Appellate
Defender, Missoula, Montana

    For Appellee:

        Timothy C. Fox, Montana Attorney General, Damon Martin, Assistant
Attorney General, Helena, Montana

        Kent M. Sipe, Fergus County Attorney, Monte J. Boettger, Deputy County
Attorney, Lewistown, Montana

Submitted on Briefs: April 29, 2020

Decided: May 26, 2020

Filed:

_____
Clerk

Justice Dirk Sandefur delivered the Opinion of the Court.

¶1 Pursuant to Section I, Paragraph 3(c), Montana Supreme Court Internal Operating Rules, we decide this case by memorandum opinion. It shall not be cited and does not serve as precedent. Its case title, cause number, and disposition shall be included in our quarterly list of noncitable cases published in the Pacific Reporter and Montana Reports.

¶2 C.T.D. appeals the judgment of the Montana Tenth Judicial District Court, Fergus County, committing her to the Montana State Hospital pursuant to §§ 53-21-126(1)(a), (c), and -127, MCA, for mental health treatment for a period not to exceed 90 days. We affirm.

¶3 On April 4, 2018, the State of Montana filed a petition for involuntary commitment and mental health treatment of C.T.D, age 36, based on two incidents. The first occurred on February 27, 2018, when Lewistown police found her walking outside on a windy 20-degree day with snow on the ground, dressed only in shorts, a tank top, and no shoes. She stated that she was walking from her brother's home to her father's home. Police found her about three quarters of a mile from her brother's home and about a mile from her father's home. A police officer later testified that she also stated, *inter alia*, that she had been "trapped in a box for the past 6,000 years" and had been "fight[ing] with the son of perdition." He testified that she also made statements about monsters, finding bodies, and that "the bodies will shock you . . . in the brain, jab you in the heart."

¶4 The second incident occurred on March 31, 2018, when police responded to her brother's home on a domestic violence report. Upon arrival, they arrested C.T.D. and her brother, citing both for partner family member assault. The brother later testified that C.T.D. was acting erratically, was verbally aggressive, and, with her frequent mood swings,

2

did not appear to be capable of caring for herself. A responding police officer later described her as "very agitated and upset." He testified that she made a number of irrational statements including stating her name as "God's love" and saying that "happy is her best friend," being arrested would make "happy angry," "[happy] wants to hurt [the responding police]," and that she "can't control [happy]."

¶5 At the jail, C.T.D. was again erratic, made suicidal statements, refused to change into jail clothing, and attempted to kick the undersheriff as staff involuntarily changed her clothes. Over the next three days in jail, C.T.D. was repeatedly screaming, banging and kicking on her cell, stripping and walking around naked in the isolation cell, and, on at least one occasion, smeared feces on the wall. She acknowledged her erratic behavior at trial, testifying that she was in such a rage that she thought she was going to have an aneurysm. She adamantly denied, however, that she had any mental problem.

¶6 The examining mental health professional testified that her first three evaluation attempts were unsuccessful due to C.T.D.'s "yelling, . . . very agitated" state, and inability to "really . . . follow any of the questions." The professional was able to meaningfully evaluate C.T.D. on the fourth try, but testified that she was still "very delusional," again "not able to . . . answer questions," had "pressured speech," and talked for an "hour nonstop about [unrelated] issues." The professional ultimately diagnosed her with a form of psychosis, schizophrenia or schizoaffective disorder, and bipolar disorder with psychotic features.

¶7 Following the adjudicatory trial, the District Court found that C.T.D. suffered from a mental disorder and that her "mental state ha[d] deteriorated . . . to the point where she is

a danger to herself, to others[,] and unable to care for her own basic needs, clothing, shelter, health[,] or safety." The court thus ultimately concluded that she required involuntary commitment pursuant to § 53-21-126(1)(a), (c), MCA.

¶8 In the subsequent dispositional hearing, the court heard testimony about available treatment options, including placement with her sister, a nursing home, the Montana Mental Health Nursing Care Center, and the state hospital. In that regard, the examining professional testified that: (1) C.T.D. had no insight into her illness and was thus "less likely to be willing to treat the problem"; (2) prescribed medication would likely be part of her mental health treatment plan; (3) the state hospital was the only placement able "to enforce the [necessary] medication"; (4) a state hospital report stated that C.T.D. had stated "that she may elope from" the state hospital; and (5) authorization of involuntary medication "would be appropriate."

¶9 Upon consideration of all available options, the District Court found and concluded that the state hospital "would be the most suitable and least restrictive placement to meet [C.T.D.'s] needs." With reference to § 52-21-127(6), MCA, the court further found it "necessary for the [state hospital] . . . to have the authority to administer" involuntary medication as needed to protect C.T.D or "facilitate effective treatment." The court thus committed C.T.D. to the state hospital pursuant to §§ 53-21-126(1)(a), (c), and -127, MCA, with authorization for involuntary medication.[1] C.T.D. timely appeals.

---

[1] The court made oral findings of fact, conclusions of law, and judgments under §§ 53-21-126(1)(a), (c), and -127, MCA, from the bench at the close of the adjudicatory bench trial and dispositional hearing and then later issued more formal written findings of fact, conclusions of law, and judgment.

¶10 Based on an isolated statement of the court near the end of the dispositional hearing (i.e., "I'm pretty confident that [involuntary medication] won't be necessary" because "it's very likely that [she] will see the benefits of medication"), C.T.D. asserts there was insufficient evidence to support the court's finding that involuntary medication authorization was necessary. We disagree.

¶11 We review involuntary mental health commitments for compliance with the requirements of §§ 53-21-126 and -127, MCA. *In re D.L.B.*, 2017 MT 106, ¶¶ 7-8, 387 Mont. 323, 394 P.3d 169. Whether an involuntary commitment satisfies the requirements of §§ 53-21-126 and -127, MCA, is a conclusion of law based on applicable conclusions and applications of law and pertinent findings of fact. *In re D.L.B.*, ¶¶ 7-8. We review conclusions and applications of law de novo for correctness and findings of fact only for clear error in the light most favorable to the prevailing party. *In re D.L.B.*, ¶ 7; *In re D.K.D.*, 2011 MT 74, ¶ 12, 360 Mont. 76, 250 P.3d 856; *In re Mental Health of C.R.C.*, 2004 MT 389, ¶ 11, 325 Mont. 133, 104 P.3d 1065.

¶12 Upon an involuntary commitment, the district court "may authorize" involuntary medication upon a finding that it "is necessary to protect the respondent or the public or to facilitate effective treatment." Section 53-21-127(6), MCA. The finding must further state "the reason involuntary medication was chosen from among other alternatives." Section 53-21-127(8)(i), MCA. We review an authorization of involuntary medication for whether the court made sufficient findings of fact under § 53-21-127(6), 8(i), MCA, and whether it otherwise abused its discretion. In this context, an abuse of discretion occurs if the court authorized involuntary medication based on a clearly erroneous finding of fact or

5

otherwise acted arbitrarily, without employment of conscientious judgment, or exceeded the bounds of reason resulting in substantial injustice. *See In re D.E.*, 2018 MT 196, ¶ 21, 392 Mont. 297, 423 P.3d 586; *In re D.L.B.*, ¶¶ 7-8.

¶13 Here, unlike in *In re R.H.*, 2016 MT 329, ¶¶ 20-23, 385 Mont. 530, 385 P.3d 556 (erroneous authorization of involuntary medication based on unsupported finding that it "may be necessary"), the District Court found that authorization of involuntary medication was necessary based on the examining medical professional's unrebutted testimony that: (1) C.T.D. had no insight into her illness and was thus "less likely to be willing to treat the problem"; (2) prescribed medication would likely be part of her mental health treatment plan; (3) the state hospital was the only placement able "to enforce the [necessary] medication"; (4) a state hospital report stated that C.T.D. "had expressed that she may elope from" the state hospital; and (5) authorization of involuntary medication "would be appropriate." The court's finding is further inferentially supported by the undisputed evidence that C.T.D. was thrice uncooperative and unable to track the examiner's questions sufficient to allow a meaningful evaluation of her mental condition. Unlike in *In re R.H.*, and more akin to *In re C.B.*, 2017 MT 83, ¶¶ 37-41, 387 Mont. 231, 392 P.3d 598 (affirming involuntary medication authorization based on documented "history of medication non-compliance"), the District Court's finding of necessity under § 53-21-127(6), (8)(i), MCA, was supported by substantial evidence and we are not convinced the court misapprehended the evidence, abused its discretion, or otherwise erred. Cherry-picked out of context on appeal, the court's isolated comment at the close of hearing (i.e., that it expected C.T.D. would see the benefit of medication and that involuntary medication

6

would not be necessary) was, in context, no more than a gratuitous statement of empathetic respect to C.T.D., clearly offered to soften her disappointment with an adverse decision in a poignantly difficult situation. We hold that the District Court did not erroneously authorize involuntary medication in this case.

¶14 We decide this case by memorandum opinion pursuant to Section I, Paragraph 3(c) of our Internal Operating Rules. It presents no constitutional issues, no issues of first impression, and does not establish new precedent or modify existing precedent.

¶15 Affirmed.

/S/ DIRK M. SANDEFUR

We concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ INGRID GUSTAFSON
/S/ JIM RICE