FILED

December 2 2014

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 13-0794

DA 13-0794

IN THE SUPREME COURT OF THE STATE OF MONTANA

2014 MT 317

IN THE MATTER OF:

S.L.,

      Respondent and Appellant.

APPEAL FROM:    District Court of the Eleventh Judicial District,
In and For the County of Flathead, Cause No. DI 13-055(C)
Honorable Heidi Ulbricht, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Kathryn McEnery, McEnery Law Office, PLLC, Kalispell, Montana

      For Appellee:

      Timothy C. Fox, Montana Attorney General, Tammy K Plubell, Assistant
Attorney General, Helena, Montana

      Ed Corrigan, Flathead County Attorney, Andrew C. Clegg, Deputy County
Attorney, Kalispell, Montana

Submitted on Briefs:  September 24, 2014
Decided:  December 2, 2014

Filed:

                                Clerk

Justice Patricia Cotter delivered the Opinion of the Court.

¶1 S.L. appeals from an order of the Eleventh Judicial District Court, Flathead County, granting the State's petition for the involuntary commitment of S.L. We affirm.

¶2 S.L. raises the following issues on appeal:

1. *Whether the "deterioration standard" contained in § 53-21-126(1)(d), MCA, is unconstitutional.*

2. *Whether the District Court erroneously committed S.L. to the Montana State Hospital.*

3. *Whether § 53-21-127(2), MCA, requires a separate dispositional hearing to be held upon the request of the Respondent.*

## FACTUAL AND PROCEDURAL BACKGROUND

¶3 S.L. is a 42-year-old female who moved from the state of Maine to Montana in the early part of 2013. The record establishes that on June 6, 2013, S.L. was brought to the Kalispell Regional Medical Center (KRMC) emergency room by a friend. S.L. reported to the attending physician that she had "accidently" overdosed on 50 tablets of Valium and 20 tablets of Meclizine. S.L. initially denied any suicidal intent. However, when her boyfriend arrived and was allowed into her examination room, S.L. told him in the nurse's presence that she had intended to take her life, she felt hopeless, and would continue to try to take her life until she was successful. After her boyfriend left the hospital, she wanted to call the police to report that her boyfriend had stolen her car, wallet, and money. S.L. then attempted to leave KRMC emergency room against medical advice. Hospital security was called in to assist in detaining S.L.

2

¶4 Certified Mental Health Person Annette Darkenwald (Darkenwald) conducted an interview of S.L. Darkenwald observed that S.L. was groggy, disoriented, and evasive in answering questions. S.L. denied any suicidal intent and stated that she suffered a traumatic brain injury in 1996, which left her with "several physcial [sic] issues." Darkenwald determined that S.L. should be detained based upon the amount of ingested medications and S.L.'s need of medical stabilization. S.L. was later transferred to Pathways Treatment Center (Pathways)[1] in Kalispell, Montana.

¶5 On June 10, 2013, the State filed a Petition for Involuntary Commitment. Before the involuntary commitment hearing, however, the State dismissed the petition after it was determined that S.L. no longer met the involuntary commitment criteria.

¶6 On September 27, 2013, S.L. arrived at KRMC emergency room by ambulance. According to the report by Certified Mental Health Person Camalla Larson (Larson), S.L. had called her case manager and reported that she had ingested "her whole pill box in an attempt to end her life." The case manager then called 9-1-1 and an ambulance transported S.L. to the emergency room.

¶7 Once medically stable, S.L. was interviewed by Larson. S.L. admitted that she had taken two weeks and three days' worth of her medication and was trying to end her life; however, she indicated that she was no longer suicidal. Larson reported that the previous day S.L. had been seen by a mental health professional, "convincingly denied" being suicidal, and was discharged. Larson indicated that since June 2013, S.L. had six psychiatric

---

[1] Pathways offers inpatient and outpatient mental health and substance abuse services. Pathways Treatment Center, Kalispell Regional Medical Center, https://www.kalispellregional.org/krmc/behavioral-health/pathways (accessed on Nov. 19, 2014).

hospitalizations, including three admissions to Western Montana Mental Health Center (WMMHC)[2] and three admissions to Pathways. Larson concluded that S.L. was an imminent risk of harming herself. She opined that the Montana State Hospital (MSH) in Warm Springs, Montana, was the least restrictive environment because the local community mental health services had failed to stabilize S.L.

¶8 On September 27, 2013, the State a filed a Petition for Involuntary Commitment. The District Court conducted an adjudicatory hearing on October 7, 2013, after granting S.L.'s request to be examined by a professional person of her choice. At the hearing, the State elicited testimony from one medical professional and one licensed clinical professional counselor. One medical professional testified on S.L.'s behalf and S.L. also testified.

¶9 On behalf of the State, Dr. Joseph Boyle, a licensed psychiatrist in Montana, appeared telephonically and testified that he first met S.L. at Pathways in September 2013, and visited with her almost daily during her admission. He observed that she had prominent mood symptoms, severe psychosocial circumstances, and interpersonal difficulties. Dr. Boyle diagnosed S.L. with mood disorder secondary to traumatic brain injury and Axis II, dependent personality disorder stating that "there is a relationship between the brain injury and moot [sic] symptoms." He also stated that her hospitalization record indicated that she had a history of post-traumatic stress disorder.

¶10 Based upon her behavior preceding admission, Dr. Boyle concluded that S.L. was an imminent threat to herself and would have difficulty protecting her own health. As to the

---

[2] WMMHC, also located in Kalispell, provides a variety of behavioral health and crisis stabilization services. Western Montana Mental Health Center, http://www.wmmhc.org/ (accessed on Nov. 19, 2014).

prospect of imminent harm, Dr. Boyle explained that "it could be as soon as immediately," but "it's not a hundred percent." Dr. Boyle also stated that if left untreated her disorder could result in mental deterioration. He recommended S.L. be transferred to MSH as the least restrictive treatment option.

¶11 The State also called Blake Passmore (Passmore), a licensed clinical professional counselor and a certified mental health professional, who works as a therapist at Pathways. Passmore testified regarding the circumstances surrounding S.L.'s previous admissions to Pathways. Passmore was involved in S.L.'s June 6, 2013 intake when S.L. had ingested Valium and Meclizine tablets, as well as on June 23, 2013, when S.L. was admitted to Pathways for "suicidal ideation with a plan."

¶12 Passmore concurred with Dr. Boyle's diagnosis that S.L. suffers from mood disorder secondary to traumatic brain injury and dependent personality disorder. He also stated that S.L.'s history over the previous three months demonstrated that she was a threat to herself-noting that following prior discharges she had quickly called the crisis line to convey that she was suicidal.

¶13 Passmore believed that S.L. had the ability to care for her basic needs, but her dependent personality put her at risk of feeling "caught up" and "trapped" leading her to "do almost anything . . . to escape, such as overdose." Passmore recommended that she be transferred to MSH, noting that no other community resources were available as S.L. had lost placement at Samaritan House and A Ray of Hope, and neither The Abbie Shelter nor

The Safe House would accept her.[3] As to the threat of imminent harm, Passmore testified that S.L. had quickly decompensated in the past and was likely to make another overdose attempt and become suicidal.

¶14 Dr. Dustin Sulak, an osteopathic physician licensed in Maine, appeared telephonically and testified on behalf of S.L. Dr. Sulak first met S.L. in 2010 and had maintained periodic communication with her since she moved to Montana. He was aware of her medical history, including her traumatic brain injury and her numerous admissions to Acadia Mental Health Hospital in Maine. Dr. Sulak was also familiar with S.L.'s medications, including antipsychotic medications, mood stabilizers, seizure medications, antidepressants, stimulants, benzodiazepine, and sleeping aids, as well as her diagnosis of a mood disorder, a personality disorder, and intermittent explosive disorder by mental health professionals in Maine. Dr. Sulak acknowledged that his general practice does not focus on psychiatric health.

¶15 Dr. Sulak testified that S.L. did receive some benefit from psychiatric medication; however, he stated that despite mental health interventions she had attempted to commit suicide on five occasions. He opined that non-pharmacological treatments such as neural feedback and other behavioral therapies would likely be the more successful alternative to inpatient psychiatric admission.

---

[3] Each of these facilities is located in Flathead County and provides a range of community services. For example, Samaritan House and A Ray of Hope offer shelter and basic needs for those with limited or no resources; The Abbie Shelter serves victims and survivors of domestic and sexual violence; and The Safe House, as part of WMMHC, is a crisis stabilization facility. Samaritan House, *Homeless in the Flathead*, http://homelessintheflathead.blogspot.com/ (accessed on Nov. 19, 2014); A Ray of Hope, http://www.arayofhopemontana.com/ (accessed on Nov. 19, 2014); The Abbie Shelter and Violence Free Crisis Line, http://violencefreecrisisline.org/ (accessed on Nov. 19, 2014); Crisis Residential-The Safe House, Western Montana Mental Health Center, http://wmmhc.net/crisis-residential (accessed on Nov. 19, 2014).

¶16    S.L. then testified on her own behalf. S.L. relayed that on the day of her admission, she was kidnapped by her husband on her way to the courthouse to secure a restraining order against him. She stated that her husband forced her to stay in a room at his house and would not allow her to use a telephone or go outside. S.L. believed her only escape option was to overdose on her medication, which would require her husband to call 9-1-1. S.L. claimed she knew that ingesting high doses of seizure medication would not be lethal and that she had no intention of committing suicide. She attributed her behavior to her traumatic brain injury and poor impulse control and indicated that the prior psychiatric hospitalizations in Maine had only worsened her condition.

¶17    Although she did not have the "most concrete plan" if discharged, S.L. said she would go to Motel 6, get a ride to Missoula from a trusted friend, and then take a bus from Missoula to Maine where she could reunite with her family, therapy dogs, and medical resources. In closing, counsel for S.L. requested that the court hold a separate disposition hearing if it determined she suffered from a mental disorder.

¶18    The District Court concluded that S.L. suffered from a mental disorder and ordered a commitment on October 7, 2013. It premised its commitment order on § 53-21-126(1)(c) and (d), MCA, citing evidence establishing that S.L. posed an imminent threat to herself and that S.L.'s mental condition would deteriorate if left untreated. The order of commitment was for a period not to exceed ninety days. The court determined that MSH was the least restrictive treatment alternative. It did not hold a separate disposition hearing. S.L. was unconditionally discharged on October 18, 2013.

¶19    S.L. now appeals the District Court's involuntary commitment order.

**STANDARDS OF REVIEW**

¶20 We review a district court's civil commitment order to determine whether the court's findings of fact are clearly erroneous and its conclusions of law are correct. *In re R.W.K.*, 2013 MT 54, ¶ 14, 369 Mont. 193, 297 P.3d 318. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if we are left with a definite and firm conviction that a mistake has been made after reviewing the entire record. *In re R.W.K.*, ¶ 14. "[W]e must view the evidence in the light most favorable to the prevailing party when determining whether substantial credible evidence supports the district court's findings." *In re Mental Health of A.S.B.*, 2008 MT 82, ¶ 17, 342 Mont. 169, 180 P.3d 625 (citation omitted). "We normally defer to a district court's determination of witness credibility and evidentiary weight." *In re C.R.*, 2012 MT 258, ¶ 18, 367 Mont. 1, 289 P.3d 125 (quoting *In re G.M.*, 2008 MT 200, ¶ 38, 344 Mont. 87, 186 P.3d 229). We require "strict adherence" to the statutory scheme governing involuntary commitment due to the "critical importance", of the constitutional rights at stake. *In re C.R.*, ¶ 13 (quoting *In re Mental Health of L.K.-S.*, 2011 MT 21, ¶ 15, 359 Mont. 191, 247 P.3d 1100).

¶21 An appeal from an order of involuntary commitment is not moot despite the appellant's release, since the issues are capable of repetition, yet otherwise would evade review. *In re C.R.*, ¶ 14.

**DISCUSSION**

¶22 *1. Whether the "deterioration standard" contained in § 53-21-126(1)(d), MCA, is unconstitutional.*

8

¶23    S.L. first argues that the "deterioration standard" set forth in § 53-21-126(1)(d), MCA, is unconstitutional.  Because we find that the District Court's involuntary commitment order is supported by alternate and independent grounds, we decline to address S.L.'s constitutionality claim.  *See* § 53-21-127(7), MCA, ("Satisfaction of any one of the criteria listed in 53-21-126(1) justifies commitment pursuant to this chapter.").   We have repeatedly observed that courts should avoid constitutional issues whenever possible.  *In re S.H.*, 2003 MT 366, ¶ 18, 319 Mont. 90, 86 P.3d 1027.

¶24    *2.   Whether the District Court erroneously committed S.L. to the Montana State Hospital.*

¶25    S.L. contends that the District Court's involuntary commitment determination is not supported by sufficient evidence.  She maintains that a mental disorder was not proven to a reasonable medical certainty, that she was not an imminent threat to herself, and that MSH was not the least restrictive treatment option.

¶26    In adjudicating a petition for involuntary commitment, a court must first determine whether the individual suffers from a mental disorder.[4]   Section 53-21-126(1), MCA.  If there is a finding of a mental disorder, the court must then consider the criteria set forth in § 53-21-126(1), MCA, to determine whether commitment is appropriate.

¶27    Commitment is justified if any one of the following criteria is satisfied:

  (a)   whether the respondent, because of a mental disorder, is substantially unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety;

---

[4]  A mental disorder is defined as "any organic, mental, or emotional impairment that has substantial adverse effects on an individual's cognitive or volitional functions." Section 53-21-102(9)(a), MCA.

(b) whether the respondent has recently, because of a mental disorder and through an act or an omission, caused self-injury or injury to others;

(c) whether, because of a mental disorder, there is an imminent threat of injury to the respondent or to others because of the respondent's acts or omissions; and

(d) whether the respondent's mental disorder, as demonstrated by the respondent's recent acts or omissions, will, if untreated, predictably result in deterioration of the respondent's mental condition to the point at which the respondent will become a danger to self or to others or will be unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety. Predictability may be established by the respondent's relevant medical history.

Section 53-21-126(1), MCA; *see* § 53-21-127(7), MCA, ("Satisfaction of any one of the criteria listed in 53-21-126(1) justifies commitment pursuant to this chapter.").

¶28     Imminent threat of injury "must be proved by overt acts or omissions, sufficiently recent in time as to be material and relevant as to the respondent's present condition." Section 53-21-126(2), MCA.

¶29     The District Court first concluded that S.L. suffered from a mental disorder, citing Dr. Boyle's testimony that S.L. suffered from a mood disorder secondary to a traumatic brain injury and Axis II, dependent personality disorder—a diagnosis consistent with S.L.'s history. The District Court noted that Passmore agreed with Dr. Boyle's conclusions. Further, Dr. Sulak acknowledged that mental health professionals in Maine had also diagnosed S.L. with a mood disorder and a personality disorder. Though Dr. Sulak testified that S.L.'s symptoms are the result of a traumatic brain injury, "[w]e normally defer to a district court's determination of witness credibility and evidentiary weight." *In re C.R.*, ¶ 18

(quoting *In re G.M.*, ¶ 38). In viewing the evidence in the light most favorable to the State, we conclude the District Court's finding of a mental disorder is not clearly erroneous.

¶30    Next, the District Court concluded that S.L. presented an imminent threat of self-injury based upon her mental disorders and past suicide attempts. *See* § 53-21-126(1)(c), MCA. S.L. disputes having suicidal intent, and maintains there was insufficient evidence to prove that she posed an imminent risk of harm to herself, noting that Dr. Boyle and Passmore could not say with exact precision when she would carry out that threat. We disagree.

¶31    As we have stated, an imminent threat:

> [D]oes not mean that a person may possibly cause an injury at some time in the distant or uncertain future. The danger must be fairly immediate. At the same time, the law does not require proof beyond a reasonable doubt that an injury will occur in the future. Threat is not certainty. The law requires only proof beyond a reasonable doubt that the threat of future injury presently exists and that the threat is imminent, that is, impending, likely to occur at any moment. If beyond a reasonable doubt there is a present indication of probable physical injury which is likely to occur at any moment or in the immediate future, and if this injury would be a result of a mental disorder, then the person suffering from such mental disorder is seriously mentally ill within the meaning of the act.

*In re Mental Health of A.S.B.*, ¶ 27 (citing *In the Matter of F.B.*, 189 Mont. 229, 233, 615 P.2d 867, 869 (1980)).

¶32    There was ample evidence before the District Court that S.L. had committed recent overt acts "material and relevant" to her present condition. *See* § 53-21-126(2), MCA. The testimony revealed at least seven prior suicide attempts: five in Maine as testified to by Dr. Sulak, and two attempts which led to her admissions into KRMC emergency room on June 6, 2013, and again on September 27, 2013. Additionally, the record showed S.L. had three

11

prior psychiatric admissions to WMMHC and three prior admissions to Pathways, including admittance on June 23, 2013, for having "suicidal ideation with a plan."

¶33     S.L. does not dispute intentionally overdosing on her medications; rather, she insists that her actions were driven solely by a desire to "escape" an abusive relationship. However, we conclude her behavior supports the imminent threat concerns articulated by Passmore:

> I think history has established over the last three-month period that she gets discharged from a hospital or our safe house, where she's been numerous times since June, and she presents very quickly calling the Crisis Line saying that she's suicidal, saying that she can't handle taking care of whatever situation she's in, and she becomes so desperate that she begins to make a suicide attempt to get out of [sic] current situation she's in.
>
> I think we've established over the last three months that she quickly decompensates and will require an increased level of care if we were to discharge her today.
>
> .   .   .
>
> I think her dependent personality puts her at risk because of relationships she has with other people where she feels so caught up and so trapped that she's willing to do almost anything she can do to escape, such as overdose on medications.

¶34     Passmore went on to state that S.L. would attempt suicide again, but was uncertain whether it would "happen today or in three days, but I can tell you it's going to." Dr. Boyle opined that S.L.'s imminent threat to herself "could be as soon as immediately."

¶35     As we have stated, although it need not be certain, the threat of future injury must "presently exist[]" and be "likely to occur at any moment." These criteria are clearly met here. *See Matter of F.B.*, 189 Mont. at 233, 615 P.2d at 869. We therefore conclude that the record contains sufficient evidence that S.L. posed an imminent threat of self-harm.

12

¶36    Finally, S.L. argues that the court should have considered outpatient and non-pharmacological therapies in Maine as less restrictive treatment options. S.L. admitted that her plan to stay at a Motel 6, hitching a ride from a friend to Missoula, Montana, and then taking a bus from Missoula to Augusta, Maine, was not "the most concrete." We conclude the court did not err in rejecting this vague course of treatment. Further, the District Court correctly found that MSH was the least restrictive treatment option as, undisputedly, all other treatment facilities in Flathead County had been considered but none would accept S.L. Based upon the record before us, we conclude that the District Court's decision to commit S.L. to MSH was not clearly erroneous.

¶37    *3. Whether § 53-21-127(2), MCA, requires a separate dispositional hearing to be held upon the request of the Respondent.*

¶38    S.L. next challenges the District Court's decision to immediately proceed with the disposition hearing after finding that S.L. suffered from a mental illness. She relies upon § 53-21-127(2), MCA, which states in pertinent part:

> If it is determined that the respondent is suffering from a mental disorder and requires commitment within the meaning of this part, the court shall hold a posttrial disposition hearing . . . [which] must be held within 5 days . . . during which time the court may order further evaluation and treatment of the respondent.

¶39    Nothing in the plain language of the statute precludes the court from immediately proceeding to a disposition hearing after a finding that the respondent suffers from a mental disorder. Although S.L. maintains that the court's failure to hold a subsequent stand-alone disposition hearing has violated her rights to due process, she does not explain how this is so. The record clearly supports the District Court's determination that MSH was the least

13

restrictive placement alternative, given that other community treatment facilities were unavailable to S.L. and the court's rejection of her indefinite plan to return to Maine. Under these circumstances, a subsequent disposition hearing would have served no purpose. We therefore conclude that S.L. has failed to demonstrate that the court's decision not to hold a subsequent stand-alone disposition hearing has deprived her of her rights to due process.

## CONCLUSION

¶40    For the foregoing reasons, we affirm the District Court's involuntary commitment order.

/S/ PATRICIA COTTER

We Concur:

/S/ BETH BAKER
/S/ LAURIE McKINNON
/S/ MICHAEL E WHEAT
/S/ JIM RICE