FILED

11/29/2016

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0316

DA 15-0316

IN THE SUPREME COURT OF THE STATE OF MONTANA

2016 MT 307

IN THE MATTER OF:

C.V.,

      Respondent and Appellant.

APPEAL FROM:    District Court of the Seventh Judicial District,
In and For the County of Dawson, Cause No. DI 15-02
Honorable Richard A. Simonton, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Brian Bulger, Attorney at Law, Great Falls, Montana

      For Appellee:

      Timothy C. Fox, Montana Attorney General, Micheal Wellenstein, Assistant Attorney General, Helena, Montana

      Oliva Norlin-Rieger, Dawson County Attorney, Glendive, Montana

            Submitted on Briefs:  September 28, 2016

                      Decided:  November 29, 2016

Filed:

_____
           Clerk

Justice James Jeremiah Shea delivered the Opinion of the Court.

¶1     C.V. appeals from a May 8, 2015 Order of the Seventh Judicial District Court, Dawson County, granting the State's petition for involuntary commitment.

¶2     We address the following issues on appeal:

*Issue One: Whether the District Court erred in finding there was sufficient evidence to commit C.V. to the Montana State Hospital.*

*Issue Two: Whether C.V.'s right to remain silent was violated.*

*Issue Three: Whether C.V.'s right to due process was violated.*

¶3     We affirm in part and reverse in part.

## PROCEDURAL AND FACTUAL BACKGROUND

¶4     On April 29, 2015, the Dawson County Attorney petitioned the District Court for the involuntary commitment of C.V., alleging that as the result of a mental disorder, she was unable to provide for her own basic needs of safety, there was an imminent threat of injury to herself or others, and her recent acts or omissions would, if untreated, predictably result in deterioration of her mental condition to the point at which she would become a danger to herself or others or would be unable to provide for her own basic need of safety. The petition included mental health professional Albinus Heidt's report detailing his diagnosis of C.V. with a delusional disorder, and his conversations with two complaining witnesses, Tara Oakland and Kristin Thompson, regarding their interactions with C.V.

¶5     Mr. Heidt met with C.V. at the Glendive Medical Center to conduct a mental health evaluation, in which C.V. chose not to participate. In rambling speech and

tangential responses to Mr. Heidt's questions, C.V. denied any serious mental illness, and communicated that she believed an acquaintance, Cy Wyse, was cheating her out of money and the Oakland family was blacklisting her from employment. C.V. was unable or unwilling to tell Mr. Heidt where she lived. When Mr. Heidt asked C.V. whether she was employed, she replied that this information "was either secret or confidential and she could not divulge that" to him. Mr. Heidt received information about C.V. from Oakland, Thompson, Wyse, Katie Mills of the Dawson County Sheriff's Office, and Dr. Joe Leal, C.V.'s treating physician. Because C.V. refused to participate in the mental health evaluation, Mr. Heidt relied heavily on information from these other sources— which included interviews with complaining witnesses and documents filed with Sheriff's Office by the complaining witnesses and C.V., herself—to reach his diagnosis that C.V. suffers from a delusional disorder.

¶6      The District Court found the petition established probable cause that C.V. suffers from a mental disorder that requires her commitment. Between April 30 and May 8, 2015, an initial hearing, an adjudicatory hearing, and a dispositional hearing were held.

¶7      At the initial hearing on April 30, 2015, C.V. argued the State did not have probable cause to file the commitment petition, and the District Court proceeded with the hearing to establish probable cause at which Mr. Heidt, Thompson, and Oakland testified.

¶8      Mr. Heidt testified as an expert witness and mental health professional regarding his diagnosis of C.V.'s delusional disorder, and that her own safety and the safety of others were at risk because of her delusional disorder. Mr. Heidt stated that C.V. does not recognize that she has a delusional disorder, and explained that a person with a

3

delusional disorder distorts reality. When asked how a person with a delusional disorder is affected, Mr. Heidt testified: "What happens is that the individual ends up—in this case ends up saying and doing things which has [sic] been escalating other people in the community to become scared for their own safety and the safety of their children." The District Court scheduled the commitment hearing for May 4, 2015, and appointed Cindy Heidt as the professional person ordered to conduct a mental health evaluation and submit a written report. The District Court appointed Linda O'Connor as C.V.'s Appointed Friend.

¶9 At the initial hearing, Thompson, the office manager for Oaks Disposal Trucking, testified that C.V. has repeatedly called Oaks Disposal Trucking regarding employment despite being told there were no openings. Thompson stated C.V. would berate and harass her and other employees during phone calls and messages to the point Thompson considered quitting her job. During one voice message, C.V. stated she knew Thompson's home address, which caused Thompson concern for her family's safety. Thompson stated she was seeking an order of protection against C.V., and although she had never seen C.V. in person before the hearing on April 30, 2015, their interactions over the phone caused Thompson to change her behavior when out in the community.

¶10 Oakland, the owner of several businesses in the community including Oaks Disposal Trucking, also testified at the initial hearing. Oakland stated C.V. frequently called seeking employment or trying to contact Wyse, who does not work for any of Oakland's businesses, and that C.V.'s calls always reverted to complaining about a car and asserting that Wyse owed her money. When C.V. called demanding a job application

4

for driving trucks, Oakland informed C.V. that Oakland does not own or work for the trucking business and instructed her to not call back. Oakland testified C.V. called up to five times a day every couple of months since July 2013, and the intensity of the calls increased over the last two months. C.V. also called Oakland's father-in-law's insurance company and Oakland's accountant. C.V. demanded a W-2 form from Oakland's accountant even though C.V. was never employed by Oakland's businesses. Oakland testified C.V. filed three complaints with federal agencies regarding employment with Oakland's businesses, and made false allegations to those federal agencies and local law enforcement. Oakland stated that the phone calls and complaints caused her to alter her activities because she was concerned C.V.'s behavior was escalating.

¶11 Finding unrebutted testimony that C.V. suffers from a delusional disorder, the District Court found C.V. posed an imminent threat of injury to herself and others, noting: "[W]hile she may not be a direct risk to others or herself, the danger in part is the response of the people that she's stalking and harassing and how they're going to react to protect themselves."

¶12 On May 4, 2015, Ms. Heidt filed her report with the District Court, and at the May 4, 2015 adjudicatory hearing, Ms. Heidt testified to a reasonable degree of medical certainty that C.V. suffers from a delusional disorder mixed type with grandiose and persecutory features. Ms. Heidt explained the delusional disorder is a thought disorder and available treatment includes antipsychotic medications, teaching reality thinking and cognitive types of therapy. Ms. Heidt testified there was an imminent threat of injury to C.V. as a result of her delusional disorder because:

5

Some of the things that she's been doing is going to people's places and she has gone to Mr. Wyse's home on several occasions at night and sometimes when he has been sleeping. And that could be a danger either to him or to herself because sometimes people, if they don't know and there is a prowler, sometimes they protect themselves. And that would be a significant concern.

Based on her observations of C.V. and C.V.'s refusal of treatment at the Glendive Medical Center, which lacks a psychiatric ward, Ms. Heidt stated C.V. required treatment at the Montana State Hospital due to the escalation of C.V.'s behavior and the risk she posed to herself and others.

¶13 Also on May 4, 2015, O'Connor filed her report with the District Court. C.V. refused to speak with O'Connor, and referred O'Connor to her attorney. O'Connor's report had to rely on documents provided by the County Attorney detailing C.V.'s activities and behavior. At the adjudicatory hearing, O'Connor recommended C.V. be committed for treatment.

¶14 At the May 8, 2015 dispositional hearing, the State called Ms. Heidt to testify regarding her recommendations, and C.V. called one lay witness, Charles Nemec, to testify regarding his interactions with C.V. Ms. Heidt recommended C.V. be placed at the Montana State Hospital for treatment. Nemec testified that he previously evicted C.V. from an apartment for having an unauthorized dog, and found C.V.'s apartment to be well kept and her demeanor under the circumstances very pleasant. Following the dispositional hearing, the District Court issued its written findings of facts, conclusions of law, and order of commitment (Order). The District Court found C.V. suffers from a delusional disorder and that there was an imminent threat of injury to herself or others

from C.V.'s acts or omissions. The District Court committed C.V. to the Montana State Hospital for a period not to exceed ninety days as the least restrictive placement because no alternative treatment exists within the community.

## STANDARDS OF REVIEW

¶15 We review a district court's civil commitment order to determine whether the court's findings of fact are clearly erroneous and its conclusions of law are correct. *In the Matter of S.L.*, 2014 MT 317, ¶ 20, 377 Mont. 223, 339 P.3d 73. A finding of fact is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if we are left with a definite and firm conviction that a mistake has been made after reviewing the entire record. *S.L.*, ¶ 20. We view the evidence in the light most favorable to the prevailing party when determining whether substantial credible evidence supports the district court's findings. *In the Matter of the Mental Health of A.S.B.*, 2008 MT 82, ¶ 17, 342 Mont. 169, 180 P.3d 625 (citation omitted). Due process claims arising from an involuntary civil commitment are subject to plenary review. *In the Matter of M.K.S.*, 2015 MT 146, ¶ 10, 379 Mont. 293, 350 P.3d 27.

## DISCUSSION

¶16 *Issue One: Whether the District Court erred in finding there was sufficient evidence to commit C.V. to the Montana State Hospital.*

¶17 C.V. argues the District Court erred in concluding that the State met its burden to commit her to the Montana State Hospital because the mental health professionals' reports relied on sources that contained hearsay and the complaining witnesses did not

sufficiently substantiate that C.V. posed an imminent threat of harm to herself or others. *See* § 53-21-126, MCA; *see also In the Matter of the Mental Health of T.J.D.*, 2002 MT 24, 308 Mont. 222, 41 P.3d 323; *In the Matter of the Mental Health of D.L.T.*, 2003 MT 46, 314 Mont. 297, 67 P.3d 189, *overruled on other grounds by Johnson v. Costco Wholesale*, 2007 MT 43, ¶ 16, 336 Mont. 105, 152 P.3d 727. C.V. contends that because neither Thompson nor Oakland testified that C.V. made an articulated or specific threat during her phone calls and they saw C.V. in person for the first time during the April 30, 2015 initial hearing, their testimony failed to meet the statutory standard of showing an imminent threat to self or others. C.V. also contends the mental health professionals relied on hearsay information regarding C.V.'s interactions with Wyse to form the bases of their opinions, and without that inadmissible hearsay, their opinions were not sufficient to show C.V. posed an imminent threat of harm to herself or others. *See D.L.T.*, ¶¶ 16-17; *T.J.D.*, ¶ 14.

¶18 The State argues C.V. failed to raise any timely objections, including hearsay objections, to the mental health professionals' delusional disorder diagnosis during the District Court proceedings, and therefore waived appellate review of the hearsay claims. *See In the Matter of K.M.G.*, 2010 MT 81, ¶ 36, 356 Mont. 91, 229 P.3d 1227. The State also argues any alleged inadmissible hearsay that Ms. Heidt relied on to diagnose C.V. and formulate her opinion was harmless error, because Ms. Heidt relied on other evidence that was not hearsay, including witness testimony and admissions filed by C.V. with the clerk of court. *See* M. R. Evid. 801(d)(2); *A.S.B.*, ¶ 36.

¶19 In involuntary commitment cases, the district court must find the respondent suffers from a mental disorder to a reasonable medical certainty, and then determine whether the respondent requires commitment. Section 53-21-126, MCA. To determine whether the respondent requires commitment, the court considers criteria listed in § 53-21-126(1), MCA. Satisfaction of any of the criteria justifies commitment. Section 53-21-127(7), MCA. The State relied on the two following criteria in this case:

> (c) whether, because of a mental disorder, there is an imminent threat of injury to the respondent or to others because of the respondent's acts or omissions; and
> (d) whether the respondent's mental disorder, as demonstrated by the respondent's recent acts or omissions, will, if untreated, predictably result in deterioration of the respondent's mental condition to the point at which the respondent will become a danger to self or to others or will be unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety. Predictability may be established by the respondent's relevant medical history.

Section 53-21-126(1)(c)-(d), MCA.

¶20 The standard of proof in a hearing on an involuntary commitment petition is proof beyond a reasonable doubt with respect to any physical facts or evidence and clear and convincing evidence as to all other matters. Section 53-21-126(2), MCA; *A.S.B.*, ¶ 23. "Imminent threat of self-inflicted injury or injury to others must be proved by overt acts or omissions, sufficiently recent in time as to be material and relevant as to the respondent's present condition." Section 53-21-126(2), MCA; *A.S.B.*, ¶ 23.

¶21 Pursuant to § 53-21-126(2) and (4), MCA, the State is obligated to introduce evidence of the Respondent's recent overt acts or omissions separate from the professional person's testimony. *D.L.T.*, ¶¶ 16-17. "The written report of the

professional person indicating the diagnosis 'may be attached to the petition, but any matter otherwise inadmissible, such as hearsay matter, is not admissible merely because it is contained in the report.'" *T.J.D.*, ¶ 14 (quoting § 53-21-126(3), MCA). In *T.J.D.*, we held the district court erroneously relied on inadmissible hearsay statements contained in the professional person's report, and reversed T.J.D.'s commitment because the report's hearsay information was the only evidence of an imminent threat of injury in the record. *T.J.D.*, ¶¶ 16-18. Similarly, in *D.L.T.*, we held that the district court abused its discretion by admitting hearsay testimony through the professional person, who was the only witness at the hearing, and solely relying on that inadmissible hearsay testimony as sufficient evidence to support D.L.T.'s involuntary commitment. *D.L.T.*, ¶¶ 10, 18.

¶22 Unlike in *T.J.D.* and *D.L.T.*, where the State presented evidence about the respondent's acts through the professional person's testimony alone, in this case, the State presented additional evidence of C.V.'s overt acts through witness testimony that showed C.V. posed an imminent threat of injury to herself or others and, if left untreated, her mental health would deteriorate. Moreover, Ms. Heidt relied on admissions made by C.V. in filings with the Dawson County clerk of court. M. R. Evid. 801(d)(2) (providing a statement offered against a party that is the party's own statement is not hearsay). Two witnesses testified C.V.'s harassing phone calls and stalking behavior were escalating, and Ms. Heidt opined these were threats that showed C.V. posed an imminent threat of harm to herself or others and that, if left untreated, C.V.'s condition would deteriorate. Section 53-21-126(1)(c)-(d), MCA. Viewing the evidence in a light most favorable to the State as the prevailing party, we conclude the State met its burden of establishing that

C.V. posed an imminent threat of harm to herself or others and that, if left untreated, her condition would continue to deteriorate. The District Court's finding that there was an imminent threat of injury to C.V is supported by substantial credible evidence, and is not clearly erroneous.

¶23 *Issue Two: Whether C.V.'s right to remain silent was violated.*

¶24 C.V. argues both the mental health professionals' reports and the District Court's findings relied in part on C.V.'s exercise of her right to remain silent and refusal of a mental health evaluation to determine whether C.V. suffers from a delusional disorder. The State argues C.V. never objected to the reports or the delusional disorder diagnosis during the District Court proceedings. The State also argues C.V. failed to adhere to M. R. App. P. 12(1)(g), which requires an Appellant's argument "contain the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the authorities, statues, and pages of the record relied on." *State v. Gunderson*, 2010 MT 166, ¶ 12, 357 Mont. 142, 237 P.3d 74 (holding it is not the Court's obligation to conduct legal research or develop legal analysis that might support a party's position). We agree.

¶25 C.V. never raised objections to the mental health professionals' diagnoses. We generally will not review a claim to which a party has failed to object or otherwise properly preserve for appeal in the district court. *K.M.G.*, ¶ 36. We will not reverse a district court that was not given an opportunity to correct the alleged error. *Siebken v. Voderberg*, 2015 MT 296, ¶ 19, 381 Mont. 256, 359 P.3d 1073 (citation omitted). C.V. also fails to support her argument that the District Court violated her right to remain

11

silent with any legal authority or legal analysis. Therefore, we hold C.V. waived appellate review of this issue by failing to object during the District Court proceedings.

¶26 *Issue Three: Whether C.V.'s right to due process was violated.*

¶27 The District Court stated in its Conclusions of Law VII: "Should the Respondent not comply with discharge recommendations from the Montana State Hospital, Warm Springs, the Respondent be immediately taken back to the Montana State Hospital, Warms Springs, Montana to continue treatment."

¶28 C.V. argues the District Court's Order gave Montana State Hospital officials the discretion to return C.V. to the hospital for further treatment after discharge if hospital staff determine at any time she does not follow the discharge recommendations in violation of § 53-21-128, MCA, which regulates the extension of the initial three-month commitment period. C.V. asserts that the Order violates due process because it makes no provision for any further hearings or determinations by the District Court as to an alleged violation of the discharge recommendations and leaves commitment to the sole discretion of hospital staff.

¶29 "[I]t is not only counsel for the patient-respondent, but also courts, that are charged with the duty of safeguarding the due process rights of individuals involved at every stage of the proceedings, and must therefore rigorously adhere to the standards . . . mandated under Title 53, Chapter 21." *In the Matter of the Mental Health of K.G.F.*, 2001 MT 140, ¶ 92, 306 Mont. 1, 29 P.3d 485. As we have long held, these statutes must be strictly followed. *T.J.D.*, ¶ 20; *D.L.T.*, ¶ 8.

12

¶30 Section 53-21-128, MCA, provides extensive due process safeguards for the extension of the initial three-month commitment period: (1) the professional person in charge of the respondent at the hospital must petition the district court for an extension not less than two weeks prior to the end of the three-month commitment; (2) a written report about the respondent's mental and physical condition must accompany the petition; and (3) the report must include descriptions of the tests, evaluations, and past and future courses of treatment. Once the petition to extend the commitment is filed with the district court: (1) notice must be given to the respondent, next of kin, counsel, and appointed Friend of the respondent; (2) a hearing must be held if requested, which shall follow the same procedure as an original hearing under § 53-21-126, MCA, with the exception of the right to a jury trial; and (3) if no hearing is requested, the district court shall enter an order of commitment not to exceed six months. Section 53-21-128(1), MCA.

¶31 The District Court's Order provided for no safeguards or due process before allowing for C.V.'s recommitment if it is alleged that she has failed to comply with discharge recommendations. Section 53-21-127(4), MCA, provides: "[e]xcept as provided in [§ 53-21-127(3)(b)(ii), MCA, regarding commitments within the community], a treatment ordered pursuant to this section may not affect the respondent's custody or course of treatment for a period of more than 3 months." Once a respondent is discharged after a ninety-day commitment, the State must initiate new proceedings to commit the respondent for treatment again. The District Court erred by allowing for C.V.

13

to be immediately taken back to the Montana State Hospital to continue treatment if she did not comply with discharge recommendations after the ninety-day commitment.

## CONCLUSION

¶32     For the foregoing reasons, we affirm the District Court's decision that there was sufficient evidence to commit C.V. to the Montana State Hospital.  We reverse and remand to the District Court to strike the condition that C.V. shall be immediately taken back to the Montana State Hospital to continue treatment if she does not comply with discharge recommendations to comply with Title 53, chapter 21, MCA.


                                        /S/ JAMES JEREMIAH SHEA


We Concur:

/S/ MIKE McGRATH
/S/ PATRICIA COTTER
/S/ BETH BAKER
/S/ MICHAEL E WHEAT