FILED

04/11/2017

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 15-0698

DA 15-0698

IN THE SUPREME COURT OF THE STATE OF MONTANA

2017 MT 83

IN THE MATTER OF:

C.B.,

      Respondent and Appellant.

APPEAL FROM:    District Court of the Thirteenth Judicial District,
In and For the County of Yellowstone, Cause No. DI 15-038
Honorable Michael G. Moses, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

          Chad Wright, Chief Appellate Defender, Danny Tenenbaum, Assistant
Appellate Defender, Helena, Montana

      For Appellee:

          Timothy C. Fox, Montana Attorney General, Tammy K Plubell,
Assistant Attorney General, Helena, Montana

          Scott D. Twito, Yellowstone County Attorney, Billings, Montana

Submitted on Briefs:  February 8, 2017

Decided:  April 11, 2017

Filed:

_____
Clerk

Justice Michael E Wheat delivered the Opinion of the Court.

¶1     C.B. suffers from bipolar affective disorder, manic severe with psychotic features. She has received treatment from the Billings Clinic Psychiatric Center ("Clinic") periodically for several years. She appeals the Thirteenth Judicial District Court's order of involuntary commitment dated October 19, 2015. She claims that the District Court erroneously held that the State had satisfied its burden of proof authorizing commitment. She further asserts that the District Court improperly authorized the administration of involuntary medications by misconstruing the applicable statute, § 53-21-127(6), MCA. Lastly, C.B. claims her counsel was ineffective. We affirm.

### FACTUAL AND PROCEDURAL BACKGROUND

¶2     C.B. is a single twenty-eight-year-old female with a lengthy history of mental illness. Her medical records reveal that she is frequently noncompliant with prescribed medications, is aggressive, combative and abusive to family members, and is repeatedly, if not chronically, homeless and unemployed. Additionally, she has periodic encounters with law enforcement usually precipitated by reports that she is walking in vehicle traffic and creating a danger to herself and others. While interacting with the officers, she generally displays volatile, bizarre behavior and is, at times, incoherent.

¶3     Between April 2015 and October 2015, officers transported C.B. to the Billings Clinic four times. As a result, the Yellowstone County Attorney filed four petitions for commitment: April 23, August 13, October 1, and October 13, 2015. The first three petitions were dismissed following four to seven days of Clinic inpatient treatment during

2

which C.B. received her medications and stabilized sufficiently to be discharged. The October 13, 2015 petition was not dismissed and following appointment of counsel and a professional person/evaluator, Dr. Amy Schuett, the District Court conducted an evidentiary hearing on October 19 at which C.B. and Dr. Schuett testified.

¶4 In the court's post-hearing October 19, 2015 Findings of Fact, Conclusions of Law and Order, the District Court made the following factual findings: (1) on October 9, 2015, the Billings Police Department responded to a report of a woman wandering in traffic; (2) when the officers arrived they found a disoriented and incoherent C.B. and transported her to the Billings Clinic; (3) the Clinic staff, who knew C.B., conducted an evaluation and administered necessary medication; (4) the Clinic requested the County Attorney to file a petition for commitment to the Montana State Hospital (MSH); and (5) the Petition was filed on October 13, 2015. The court further found that while C.B. was hospitalized at the Clinic between October 9 and the October 19 evidentiary hearing, she became compliant with her medication but had not improved sufficiently to be safely discharged. The court also found that C.B.'s multiple short-term hospitalizations were ineffective and unable to stabilize her for a term longer than a few days or weeks.

¶5 The District Court's legal conclusions included: (1) the State had proven to a reasonable degree of medical certainty that C.B. suffered from a mental disorder; (2) C.B. is unable to care for herself; (3) MSH is the least restrictive treatment option available; and (4) involuntary administration of medications is authorized as it "may be necessary" to facilitate treatment.

¶6 C.B. appeals.

3

**ISSUES**

¶7 A restatement of the issues on appeal is:

¶8 Did the District Court err in concluding that the State had satisfied its burden of proof authorizing commitment?

(A) Did the District Court erroneously rely upon inadmissible hearsay in Dr. Schuett's report and testimony to support its finding that C.B. required commitment?

(B) If Dr. Schuett's hearsay testimony was properly admitted, did the District Court correctly determine that the State presented substantial evidence that C.B. was unable to provide for her own basic needs?

¶9 Did the District Court err by authorizing the administration of involuntary medication when it "may be necessary"?

¶10 Did C.B. receive effective assistance of counsel?

**STANDARD OF REVIEW**

¶11 We review a district court's civil commitment order to determine whether the court's findings of fact are clearly erroneous and its conclusions of law correct. *In re C.V.*, 2016 MT 307, ¶ 15, 385 Mont. 429, 384 P.3d 1048.

¶12 In determining whether counsel provided effective assistance in an involuntary commitment proceeding, we review five critical areas: (1) appointment of competent counsel; (2) counsel's initial investigation; (3) counsel's interview with the client; (4) the patient-respondent's right to remain silent; and (5) counsel's role as an advocate for the patient-respondent. We consider the whole record and evaluate each factor based on the facts and circumstances of the entire case. *In re C.R.*, 2012 MT 258, ¶ 28, 367 Mont. 1, 289 P.3d 125 (internal citations and quotations omitted).

4

# DISCUSSION

¶13 *Did the District Court err in concluding that the State had satisfied its burden of proof authorizing commitment?*

    *(A) Did the District Court erroneously rely upon inadmissible hearsay in Dr. Schuett's report and testimony to support its finding that C.B. required commitment?*

¶14 On appeal, C.B. claims that the District Court erred in concluding that the State had proven that C.B.'s circumstances satisfied the criteria for commitment to MSH. She specifically asserts that the court erroneously relied upon inadmissible hearsay evidence in Dr. Schuett's report and during her testimony to support its finding that she required commitment. She further argued, in the alternative, that if the hearsay testimony was properly admitted, the State did not present substantial evidence that C.B. was unable to provide for her own basic needs.

¶15 As argued by C.B., the alleged hearsay statement included in Dr. Schuett's report/testimony is the assertion that C.B. was picked up by the police on October 9, 2016, for "walking in and out of traffic." She claims that when the police arrived, she was standing in front of a house and was not walking in traffic. The Billings Clinic admission report appears to be the source of this challenged fact. The admitting nurse on October 9, 2016, was told by the officers delivering C.B. to the Clinic that she was wandering in traffic. The nurse included this statement in the Clinic's admission report and it was repeated in the subsequent Petition for Commitment. In preparing her report to the District Court, Dr. Schuett reviewed C.B.'s lengthy records and included the officer's characterization of C.B.'s location in her report. Dr. Schuett's subsequent admission

5

during the hearing that she was not present at the time of the officer's encounter with C.B. and therefore had no first-hand knowledge of where C.B. was standing was the foundation of C.B.'s claim that the statement was inadmissible hearsay. C.B. argues that without admissible evidence of "dangerous behavior," such as walking in traffic, the court had no authority to order her commitment.

¶16 The record reveals, however, that C.B. did not object at the hearing to the presentation or admission of the alleged hearsay evidence. Having failed to do so, the State did not provide, nor was it given the opportunity to argue, if, or why, the evidence was admissible. Consequently, the District Court was not given the opportunity to rule on such an objection. It is well-established, with a few exceptions, that we will not address issues raised for the first time on appeal. This is a sound rule as it would be "fundamentally unfair to fault the trial court for failing to rule correctly on an issue it was never given the opportunity to consider." *Grizzly Sec. Armored Express, Inc. v. Bancard Servs*., 2016 MT 287, ¶ 59, 385 Mont. 307, 384 P.3d 68. While C.B. claims that "this Court has never permitted less-than-rigorous adherence to Mont. Code Ann. § 53-21-126(3) based on counsel's failure to object at a commitment hearing," we are not persuaded to ignore our long-standing rule nor has C.B. requested that we exercise plain error review. The decision to invoke plain error review is discretionary and used sparingly and under specific criteria that are not met here. *State v. McDonald*, 2013 MT 97, ¶ 8, 369 Mont. 483, 299 P.3d 799.

¶17 Moreover, the cases cited by C.B. to support her request for review on appeal—*In re Mental Health of D.L.T.*, 2003 MT 46, 314 Mont. 297, 67 P.3d 189 (overruled in part on other grounds by *Johnson v. Costco Wholesale*, 2007 MT 43, ¶ 21, 336 Mont. 105, 152

P.3d 727), and *In re Mental Health of T.J.D.*, 2002 MT 24, 308 Mont. 222, 41 P.3d 323—are distinguishable and inapposite. *T.J.D.* and *D.L.T.* are distinguishable from the case before us on multiple grounds but the critical distinction is that the issue of hearsay evidence was clearly and properly before the Court on appeal in both *T.J.D.* and *D.L.T.* In *T.J.D.* the State conceded that the challenged evidence was hearsay (*T.J.D.*, ¶¶ 11, 16) and in *D.L.T.*, D.L.T. objected to the evidence during the hearing and on the record. *D.L.T.*, ¶¶ 6, 12.

¶18 The only other case upon which C.B. relies is *In re C.V.*, 2016 MT 307, 385 Mont. 429, 384 P.3d 1048. In *C.V.*, the Court was tasked with determining whether the district court erred in finding there was sufficient evidence to commit C.V. to MSH. *C.V.*, ¶ 16. The State argued that C.V. had not objected to the alleged hearsay material in the district court and consequently she had waived her right to appellate review of the issue. *C.V.*, ¶ 8. The State continued, however, that the court's admission of the hearsay evidence was harmless error because other admissible evidence supported the district court's ruling. *C.V.*, ¶ 18. The Court analyzed the case to determine whether sufficient evidence supported the district court's order of commitment and concluded that it did.

> *(B) If Dr. Schuett's hearsay testimony was properly admitted, did the District Court correctly determine that the State presented substantial evidence that C.B. was unable to provide for her own basic needs?*

¶19 Having declined to review C.B.'s issue of alleged hearsay, we review the case, as we did in *C.V.*, to determine whether the District Court erred in concluding that the State had proven the facts required to justify C.B.'s commitment, particularly whether the State presented substantial evidence that C.B. was unable to provide for her own basic needs.

7

¶20 The Billings Clinic has a well-documented medical file on C.B. As noted above, four petitions for commitment were filed between April 2015 and October 13, 2015. Each petition was accompanied by a Clinic admission report documenting the admitting interview and medical/mental evaluation. These evaluations were conducted by appropriate Clinic medical staff who reported first-hand accounts of C.B.'s condition at the time of admission. Additionally, each of these petitions and relevant Clinic medical documentation is part of the District Court's file in this case and was reviewed by the District Court.

¶21 In the April and August Clinic admitting reports, the reason for C.B.'s delivery to the Clinic by Billings police officers was that she was walking in traffic causing danger to herself and to others. As noted above, after a few days of inpatient treatment based on each of these petitions, C.B. stabilized on her medication and agreed to comply with her pharmaceutical treatment; therefore, she was discharged.

¶22 According to the September 29, 2015 admitting report attached to the October 1 Petition for Commitment, the reason for C.B.'s admission was that she was walking the streets without shoes and claiming she had chemical burns on her feet. The admitting and evaluating doctor, Dr. Schuett, documented that C.B. was "acutely psychotic" and was refusing medical and psychiatric treatment. Dr. Schuett noted in the admitting report that C.B. had been hospitalized from August 12 through August 18, 2015, and had eventually voluntarily agreed to treatment and was subsequently discharged. Dr. Schuett further observed that C.B. was not taking her medications, had stated that she was homeless, and was unable to adequately and safely care for herself. The doctor recommended involuntary

8

commitment to MSH. Based upon the October 1 Petition, the District Court appointed Dr. Schuett as C.B.'s professional person under §§ 53-21-122(2) and -123, MCA. Dr. Schuett was ordered to submit a report of examination to the court by October 6.

¶23    Dr. Schuett's report contained detailed information regarding C.B.'s condition that was based upon Dr. Schuett's personal observations and queries as well as information documented in C.B.'s Clinic medical records. The doctor ultimately concluded that C.B. needed longer-term stabilization at MSH as her short-term Clinic hospitalizations had failed to stabilize her for more than days or weeks. After Dr. Schuett's report was submitted to the Court, C.B. again stabilized, was discharged on October 7, and the petition was dismissed.

¶24    Two days later—on October 9—C.B. was transported once again to the Clinic for walking in and out of traffic and appearing incoherent and disorganized. The October 13, 2015 Petition for Commitment was filed and Dr. Schuett was again appointed as C.B.'s professional person and ordered to submit an updated report of evaluation to the court. Again, Dr. Schuett's report was based upon her personal evaluation of C.B. and consultations with C.B.'s treatment team. Dr. Schuett again recommended longer-term inpatient treatment at MSH as well as the involuntary administration of medication should C.B., as she had in the past, refuse to take her medications.

¶25    At the hearing, C.B. testified and Dr. Schuett testified for the State and was cross-examined by C.B.'s counsel. Following the hearing on October 19, 2015, the District Court issued the now-challenged order.

9

¶26 Section 53-21-126(1) and (2), MCA, require that before a district court can order the involuntary commitment of a respondent, the State must first prove "to a reasonable degree of medical certainty" that the person suffers from a mental disorder, as defined at § 53-21-102(9)(a), MCA. The District Court held that the State had proved by a reasonable medical certainty that C.B. suffers from a mental disorder and C.B. does not dispute this ruling.

¶27 Upon a determination that the respondent suffers from a mental disorder, the court must then determine if commitment is appropriate. Section 53-21-126(1), MCA, requires the district court to consider the following:

> (a) whether the respondent, because of a mental disorder, is substantially unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety;
>
> (b) whether the respondent has recently, because of a mental disorder and through an act or an omission, caused self-injury or injury to others;
>
> (c) whether, because of a mental disorder, there is an imminent threat of injury to the respondent or to others because of the respondent's acts or omissions; and
>
> (d) whether the respondent's mental disorder, as demonstrated by the respondent's recent acts or omissions, will, if untreated, predictably result in deterioration of the respondent's mental condition to the point at which the respondent will become a danger to self or to others or will be unable to provide for the respondent's own basic needs of food, clothing, shelter, health, or safety. Predictability may be established by the respondent's relevant medical history.

¶28 Section 53-21-126(2), MCA, requires that a respondent's "overt acts or omissions" be "sufficiently recent in time as to be material and relevant as to the respondent's present condition."

10

¶29 The court determined that the State proved beyond a reasonable doubt that C.B. "needs to be committed because of her mental disorder. She is unable to care for herself. Her thoughts are too disorganized to care for herself." These conclusions address all of the concerns set forth in § 53-21-126(1)(a)-(d), MCA, and are supported by facts in the record.

¶30 C.B. asserts on appeal that she testified at the hearing that she was taking care of herself—she was providing food and clothing for herself and was living with a friend so she was not homeless. She claims she was compliant with her pharmaceutical treatment and was seeing her mental health doctor monthly as required. She further asserts that the only evidence presented to support that she was unable to care for her own safety was the incorrect and alleged hearsay testimony that she was walking in the street.

¶31 We note, however, that Dr. Schuett's testimony and report and C.B.'s medical records present substantially different facts and circumstances that conflict with C.B.'s description of her condition and situation. These facts support a conclusion that at the time of this commitment, C.B. was not able to make decisions to keep herself safe and protected. Most notably, she had been hospitalized four times in the span of a few months for treatment of both physical injury and severe symptoms of acute psychosis.

¶32 We generally defer to the district court in cases involving conflicting testimony because the court has the benefit of observing witness demeanor and rendering a determination of the credibility of those witnesses. *Paschen v. Paschen*, 2015 MT 350, ¶ 42, 382 Mont. 34, 363 P.3d 444. Here, the District Court's reliance on Dr. Schuett's report and testimony as well as C.B.'s "recent" medical history was appropriate and necessary to render its decision.

11

¶33    Under these facts, the medical records from April 2015 and subsequent constitute appropriate and timely evidence of recent acts or omissions and were material and relevant to C.B.'s October 2015 condition. These records illustrate C.B.'s steady decline in mental health and ability to safely care for herself between April and October 2015. At the time she was returned to the Clinic on October 9, precipitating the filing of the fourth petition, only two days had elapsed from her discharge from the Clinic on October 7. Moreover, her return and re-admittance were for the same actions, behavior, and condition as the previous three petitions.

¶34    It was clear to Dr. Schuett and the District Court, and is clear to this Court that C.B.'s temporary and short-term inpatient care at the Clinic on three different occasions between April and October 2015, was insufficient to aid C.B. in stabilizing to the degree necessary to begin making safe decisions for herself as well as for the general public finding themselves in her proximity. The exact location of C.B. at the time the officers took her to the Clinic of October 9 is not a compelling and deciding factor when viewed in conjunction with the significant amount of information documenting C.B.'s mental health over those several months. Moreover, the District Court did not rely on or reference this disputed factual claim in its conclusions of law or order. The District Court did not err in concluding that C.B. required commitment in accordance with the relevant statutes.

¶35    C.B. does not challenge the court's ruling that the State proved by "clear and convincing evidence" that MSH is the least restrictive treatment option available to her at this time.

¶36 We affirm the District Court's conclusion that the State proved that C.B.'s circumstances satisfied the statutory criteria for commitment to Montana State Hospital and the order of commitment.

¶37 *Did the District Court err by authorizing the administration of involuntary medication when it "may be necessary"?*

¶38 C.B. next challenges the court's authorization to MSH to involuntarily administer medications to her in the event she "abruptly decide[s] not to take her medications." C.B. argues that the court's determination that involuntary medications *may be necessary* does not satisfy the standard set forth in the applicable statute, § 53-21-127(6), MCA. The relevant statement in § 53-21-127(6), MCA, provides: "The court may authorize the chief medical officer of a facility or a physician designated by the court to administer appropriate medication involuntarily if the court finds that involuntary medication *is necessary* to protect the respondent or the public or to facilitate effective treatment." (Emphasis added.)

¶39 C.B.'s argument is unpersuasive. The court's order in no way authorizes MSH to involuntarily administer medications *unnecessarily*; rather, it acknowledges that C.B. requires regular and systematic medication to return her to better mental and physical health and based upon her history of noncompliance with medications or her outright refusal to take them, the hospital is appropriately authorized to administer them involuntarily. This is not a relaxation of the standard; rather, it is a recognition of C.B.'s needs under the specific facts and circumstances of this case.

¶40 As noted above, between April and October 2015, C.B. was habitually non-compliant with her medications when she was not being overseen by Clinic staff.

13

When she received inpatient treatment through the Billings Clinic on three separate occasions during these months, she became compliant within a few days and was discharged. However, within weeks, C.B. was returned to the Clinic in a manic, incoherent, confused, and, at times, injured state. Following C.B.'s third discharge on October 7, she immediately stopped taking her medications and was returned to the Clinic on October 9. This is evidence, as determined by C.B.'s doctors and Clinic staff, that short-term treatment was no longer effective and that C.B.'s mental health was preventing her from taking her medications in a disciplined, orderly, and controlled manner. Without her medications, C.B. simply had no chance to return to a state of better mental and physical health.

¶41 We acknowledge that our decision here diverges from our decision in *In re R.H.*, 2016 MT 329, 385 Mont. 530, 385 P.3d 556, in which the district court ordered the administration of medication to R.H. as it "may be necessary to facilitate treatment" in the event R.H. "abruptly decide[d] not to take her medications." *R.H.*, ¶ 8. We reversed the district court, observing: "We find no basis on the record before us to conclude that R.H. would not take her medication and that it was necessary for the court to issue an order forcing her to do so." *R.H.* ¶¶ 21, 23. *R.H.* is distinguishable, however, in that—unlike C.B.—R.H. had no history of medication noncompliance.

¶42 Additionally, § 53-21-127(8)(h), MCA, provides that a court ordering commitment and involuntary medication, must state the reason involuntary medication was chosen from among other alternatives. The District Court expressly stated that C.B. "suffers from a bipolar affective disorder, manic with psychotic features. . . . A bipolar affective disorder cannot be cured, but it can be controlled through a combination of medication, therapy and

14

social support." The court, as did C.B.'s medical caregivers, recognized that C.B.'s mental health could not be restored without systematically-received medication over the long term.

¶43 Based upon C.B.'s specific diagnosis, her symptoms between April and October 2015, her repeated admissions to the Billings Clinic, and the unanimous decision of her medical professionals that her consistent noncompliance was preventing her improved mental health, the record and the District Court's findings and conclusions support a ruling that involuntary medication was necessary. The court's chosen language, i.e., "may be necessary," appears to be an acknowledgment that under § 53-21-127(6), MCA, the authority to administer medication is that of the chief medical officer of the facility or the designated physician. There are multiple safeguards in the relevant statutes that prevent an unwilling patient from receiving involuntary medication. Under the circumstances of this case, strict compliance with medication is critical to C.B.'s well-being. Consequently, we will not reverse the District Court's order authorizing the involuntary administration of medication.

¶44 *Did C.B. receive effective assistance of counsel?*

¶45 Lastly, C.B. argues that she received ineffective assistance of counsel (IAC) based upon counsel's failure to object to (1) alleged hearsay evidence presented by Dr. Schuett, and (2) the State's recommendation that she receive involuntary medication. C.B. also claims that counsel's limited cross-examination of Dr. Schuett was ineffective and that counsel was ineffective because the record does not indicate whether counsel sought a second evaluation for C.B. In summary, C.B. asserts that "[t]he minimal participation

demonstrated by C.B.'s counsel was severely deficient given that her fundamental individual liberty interests . . . were at stake."

¶46  C.B.'s claims of ineffective assistance implicate the fifth factor of the test set forth in ¶ 12 above, i.e., counsel's role as her advocate.  As noted above, C.B.'s claim of hearsay pertained to whether she was standing in front of a house or walking in traffic at the time the officers encountered her on October 9.  We reviewed the court's findings of fact and conclusions of law above and determined they were sufficient, correct, and supported by the record.  Additionally, we noted that the District Court did not rely upon or reference in its conclusions or its order the alleged hearsay statement and we determined that C.B.'s precise location was not a compelling or deciding factor in her need for treatment.  As the court's order was supported by substantial evidence without consideration of the alleged hearsay statement, C.B. has not demonstrated that counsel's performance in failing to object to alleged hearsay was deficient.  *See In re R.F.*, 2013 MT 59, ¶ 42, 369 Mont. 236, 296 P.3d 1189.

¶47  The record is silent regarding C.B.'s counsel's failure to object to involuntary medications but the District Court had substantial evidence before it that C.B. has a history of noncompliance with her medication.  It was the primary reason for her repeated admissions to the Clinic during this time.  It is likely that had counsel objected, the State would have successfully rebutted the objection.  C.B. fails to demonstrate counsel's ineffectiveness based upon this ground.

¶48  Similarly, C.B.'s allegation that counsel was ineffective because the record is silent as to whether counsel requested a second evaluation for C.B. fails to establish that

16

counsel's performance was deficient. Because the record is silent, we cannot discern whether this was a strategic decision on the part of counsel; however, the record contains reports of multiple interviews, hospital admissions, and evaluations of C.B. during the months involved. Consequently, the District Court had sufficient medical information before it upon which to base its findings and conclusions.

¶49 Lastly, turning to C.B.'s claim that counsel conducted ineffective cross-examination of Dr. Schuett, the record reveals that counsel established that Dr. Schuett had not been present when the police encountered C.B. on October 9 and did not know C.B.'s exact location. He further demonstrated that the statement that C.B. was walking in and out of traffic was double-hearsay in that the original assertion derived from a passer-by calling the police who in turn reported it to Dr. Schuett. Counsel also attempted to establish that some of C.B.'s mental health symptoms may be caused by other conditions rather than her mental illness. For example, her loud and pressured speech may be caused by hearing loss from a "blown eardrum," and her refusal to take her medications may be based upon side effects of the medicine rather than her mental illness.

¶50 In light of the abundant evidence supporting the District Court's findings, conclusions, and order, and counsel's attempts to provide alternate explanations for C.B.'s symptoms and behavior, we cannot conclude that counsel was ineffective.

## CONCLUSION

¶51 For the foregoing reasons, we affirm the District Court's October 19, 2015 Findings of Fact, Conclusions of Law and Order committing C.B. to MSH for a period not to exceed

three months and authorizing the administration of involuntary medication in the event C.B. refuses to take her medications.

/S/ MICHAEL E WHEAT

We Concur:

/S/ MIKE McGRATH
/S/ JAMES JEREMIAH SHEA
/S/ LAURIE McKINNON
/S/ JIM RICE